418 So.2d 996 (1982)
William Howe GILVIN, Appellant,
v.
STATE of Florida, Appellee.
No. 58743.
Supreme Court of Florida.
July 15, 1982.
Rehearing Denied September 13, 1982.
*997 James B. Gibson, Public Defender and James R. Wulchak, Chief, Appellate Division, Asst. Public Defender of the Seventh Judicial Circuit, Daytona Beach, for appellant.
Jim Smith, Atty. Gen., and C. Michael Barnette, Asst. Atty. Gen., Daytona Beach, for appellee.
ALDERMAN, Chief Justice.
William Gilvin appeals his conviction for the first-degree murder of John Hunt and his sentence of death. Finding no merit to any of his challenges to his conviction, we affirm the conviction. We reverse the sentence of death imposed after a jury recommendation of life, however, because applying the test announced in Tedder v. State, 322 So.2d 908 (Fla. 1975), we conclude that the facts suggesting the sentence of death in this case are not so clear and convincing that virtually no reasonable person could differ.
Gilvin first met the victim, John Hunt, an Episcopal priest, when early one morning in July of 1979, he was hitchhiking out of Tampa. Hunt gave him a ride and offered to allow him to spend the remainder of the night at the vicarage in Brooksville where Hunt resided. The next morning, Hunt gave Gilvin money to buy a bus ticket to Kentucky and told Gilvin that if Gilvin wanted to come back to Florida he would help Gilvin find a job and permit Gilvin to stay at the vicarage.
Several days later, Gilvin contacted Hunt to ask if Hunt's offer was still open and to tell Hunt that he had decided to return to Florida to find a job. Hunt told him the offer was still open and to come on down to Brooksville which Gilvin did, arriving back in Brooksville on Friday, July 13, 1979. The next day, he went to look for a job and, on his job application, put Hunt's name as the person to contact in case of emergency. Later that day after he and Hunt had eaten, consumed several drinks, and then smoked marijuana, Hunt asked Gilvin what he thought about homosexuals. Gilvin told Hunt that he never had engaged in homosexual activities and never intended to do so. When asked by Gilvin if he was a homosexual, Hunt answered affirmatively. Gilvin then told Hunt that he would leave immediately if Hunt was expecting him to partake in homosexual activities. Hunt assured him that this was not his intent and that he would not broach the subject again.
The next afternoon after he and Hunt drank several drinks and smoked marijuana, Hunt again told Gilvin that since he was Hunt's guest and since Hunt was helping him, he should consent to Hunt's homosexual overtures. Gilvin refused and said that he was going to leave. Hunt persuaded him to stay until the next morning since, Hunt said, it was too late to leave. Shortly thereafter, Hunt put his hand on Gilvin's leg, and Gilvin brushed it off. Hunt then went to bed.
*998 On Monday morning, Hunt promised to drive Gilvin to the interstate after he finished church business. Upon returning home, Hunt fixed a pitcher of martinis. They both drank a great deal, and Gilvin smoked marijuana. Hunt then told Gilvin that he would drive him to the interstate after he had taken a nap. He retired to his bedroom but moments later reappeared behind Gilvin either completely nude or clad solely in his undershorts, put his arms around Gilvin, and kissed him on the temple. Gilvin pushed him away, and Hunt fell to the floor at which time Gilvin testified that he saw that Hunt was nude. As Gilvin started to rise out of the chair, Hunt smacked Gilvin with his open hand and then ran back into the bedroom to look for something. Thinking that Hunt was looking for a weapon, Gilvin picked up a claw hammer from a table. When Gilvin entered the bedroom, Hunt started kicking and hitting him. Gilvin hit him several times with his hand and several more times with the hammer, but Hunt kept fighting. The fight continued for about five minutes until Hunt fell to the floor. Gilvin then stood or kneeled on Hunt and hit him several times in the back of the head with the hammer. He then tied Hunt's hands behind his back, showered, packed his belongings, put towels and newspapers over the windows, took Hunt's car, credit cards, and money, and placed a card in the door saying, "Please call tomorrow. Reverend Hunt." Gilvin was arrested two weeks later in Kentucky, still in possession of Hunt's car and credit cards.
Hunt's body was discovered the day following the fight by the church secretary. The pathologist testified that there were abrasions on Hunt's back and large lacerations in the back of his scalp and abrasions and lacerations on his face and forehead and on his shoulders and chest, that the left earlobe had been torn through, that a hole in the right cheek went through to his mouth, and that he had a fractured skull. He testified that Hunt had sustained at least fifteen blows to the head, five of which were large and that the major fracturing blows were inflicted while Hunt lay face down. Hunt died from loss of blood caused by the lacerations.
Gilvin was indicted for first-degree, premeditated murder for the killing of Hunt with a blunt instrument, was found guilty, and, after a jury's life recommendation, was sentenced to death.
Gilvin argues that his conviction should be reversed because the trial court erred in denying his motions for judgment of acquittal and for new trial. He asserts that the evidence was insufficient to establish premeditation. We hold that the trial court correctly denied these motions. The evidence is sufficient to support the jury's finding that Gilvin premeditated the killing of Hunt.
We also find no merit to Gilvin's contention that the trial court reversibly erred in denying his motion to suppress his confession and in permitting the State to introduce his taped confession as rebuttal evidence. He states that he was induced to give a confession by promises by police detectives to talk with the prosecutor about speeding up his case. He alleges that at the time of his confession, he wanted to expedite matters so that he could receive the death penalty quickly.
After a hearing, the trial court ruled that Gilvin's confession was freely and voluntarily made, and this ruling comes to us clothed with a presumption of correctness. Shapiro v. State, 390 So.2d 344 (Fla. 1980), cert. denied, 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 818 (1981). As appears from the record, Gilvin was repeatedly advised of his Miranda rights, and no promises were made to induce his confession. Rather, at Gilvin's request, the detectives said that they would forward the information supplied by Gilvin to the proper authorities in an attempt to expedite the matter insofar as possible. Furthermore, introduction of the taped confession was not reversible error. His trial testimony was inconsistent with his confession in several respects. That portion of his confession which was merely cumulative was not prejudicial.
*999 We likewise reject Gilvin's contentions that the court committed reversible error in giving the "Allen charge"[1] and reminding the jury of this charge upon recessing for the evening. His other claims of reversible error as relate to his conviction are without merit and do not necessitate discussion.
As to his sentence of death, however, we agree with Gilvin's argument that the trial court erroneously overrode the jury's life recommendation. The trial court found several aggravating circumstances, some of which constitute an improper doubling up under our pronouncement in Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977), and found no mitigating factors. There was evidence of nonstatutory mitigating factors, however, upon which the jury could have based its life recommendation even though the trial court, in its judgment, was not necessarily compelled to find them. See Lucas v. State, 376 So.2d 1149 (Fla. 1979). In evaluating the propriety of a death sentence after a jury recommendation of life, we must decide whether the facts suggesting a sentence of death are "so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d at 910. Under the totality of the circumstances presented by the evidence in this case, we cannot say that the jury's view of the evidence and its conclusions as to aggravating and mitigating factors could not reasonably differ from that of the trial court and that it could not reasonably conclude under the circumstances that a life sentence was warranted. We therefore must reverse the sentence of death.
Accordingly, we affirm Gilvin's conviction of murder in the first-degree; however, the order of the trial court sentencing Gilvin to death is quashed, and the trial court is directed to enter a sentence of life imprisonment without the possibility of parole for twenty-five years.
It is so ordered.
SUNDBERG and EHRLICH, JJ., concur.
McDONALD, J., concurs with an opinion.
BOYD, J., concurs in part and dissents in part with an opinion, in which ADKINS and OVERTON, JJ., concur.
McDONALD, Justice, concurring.
My review of the record leads me to believe that a more appropriate verdict would have been murder in the second degree rather than murder in the first degree. I concede, however, that there was sufficient competent circumstantial evidence presented upon which the jury could conclude that premeditation existed. I therefore concur in the affirmance. See Tibbs v. State, 397 So.2d 1120 (Fla. 1981).
I agree that the trial judge should not have imposed the death penalty. There was a rational basis for the jury's recommendation of life. In addition, I do not believe that any of the aggravating factors found by the trial judge were proved beyond a reasonable doubt.
BOYD, Justice, concurring in part and dissenting in part.
I concur in the affirmance of the conviction but dissent from the reduction of sentence. Appellant was an unemployed exconvict who was hitchhiking across Florida. The victim was an Episcopalian priest who followed the Biblical mandate to extend hospitality to needy strangers. As compensation for food, shelter, and other economic benefits, the appellant murdered the priest in a cruel, ruthless and senseless manner so he could steal his credit cards, automobile, and other personal property. It is significant that appellant tied the victim's hands with a cord before inflicting the mortal injuries.
Appellant's only justification for his crime was that his victim made homosexual advances to him in the victim's home. His *1000 response was to strike the priest with his fist, pursue him with a hammer, and bludgeon him to death. He claimed he did so in self-defense, since the priest was resisting the beating given him by appellant.
If indeed the victim made improper and offensive suggestions, appellant should have left the home instead of killing the man.
This crime was wholly inexcusable and without reason. There is nothing in the record to justify reduction of the death penalty to life imprisonment.
The court found that the murder was committed while appellant was engaged in the crime of robbery; that the murder was committed for the purpose of avoiding detection and arrest for crimes already perpetrated upon the victim; that the murder was committed for pecuniary gain; that the murder was committed to disrupt or hinder the enforcement of laws; that the murder was especially heinous, atrocious, or cruel; and that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The court found no mitigating circumstances.
It was error for the court to count the factors of robbery and pecuniary gain as separate aggravating circumstances. It was also error to count prevention of arrest and disruption or hindrance of law enforcement as separate aggravating circumstances. However, we can count the recited factors as two rather than four statutory aggravating circumstances and treat the error as harmless, since there are no mitigating circumstances. Hargrave v. State, 366 So.2d 1 (Fla. 1979), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1980); Washington v. State, 362 So.2d 658 (Fla. 1978), cert. denied, 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979). Furthermore, since there are no mitigating circumstances and several aggravating circumstances, death is the appropriate penalty. State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
The majority's reliance on Tedder v. State, 322 So.2d 908 (Fla. 1975), is seriously misplaced. The principle of Tedder is that when the jury recommends life, the sentencing judge should follow the recommendation if it is based on some reasonable mitigating factor shown by the evidence. Here there was no reasonable basis for the jury to recommend life. One can only speculate about the reason for the recommendation. Therefore the judge was correct in overruling the jury and sentencing the appellant to death.
ADKINS and OVERTON, JJ., concur.
NOTES
[1] Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); Fla.Std. Jury Instr. (Crim.) 2.21.