427 So.2d 723 (1983)
Michael Eugene CANNADY, Appellant,
v.
STATE of Florida, Appellee.
No. 59974.
Supreme Court of Florida.
February 24, 1983.
*725 Michael B. Mann, Sp. Public Defender, Panama City, for appellant.
Jim Smith, Atty. Gen. and Lawrence A. Kaden, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This is an appeal from a judgment imposing the death sentence for first-degree murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Appellant Michael Cannady was charged with and convicted of the first-degree murder of William Carrier, the night auditor at the Ramada Inn in Panama City. The main evidence against him consisted of statements he made to Officer Frank McKeithen. Appellant told McKeithen that on December 1, 1979, he stole some money from the Ramada Inn and kidnapped Carrier. He admitted he drove Carrier to a remote wooded area and shot him.
Before trial appellant filed a motion to suppress all oral and written statements on the grounds that they were taken in violation of his constitutional rights and that they were not freely and voluntarily given. At the suppression hearing Officer McKeithen testified that appellant seemed to be in full control of his senses when he confessed and that no threats or promises were made to induce appellant to confess. On cross-examination Officer McKeithen *726 elaborated on the events leading up to appellant's incriminating statements. Officer McKeithen explained that appellant was arrested on December 12 for an unrelated robbery and kidnapping. Because of the similarity between that crime and the one resulting in the death of Carrier, McKeithen questioned appellant as to his whereabouts on the night of the murder. Appellant told McKeithen that he was in Atlanta at that time. After failing to confirm appellant's alibi and after receiving information that appellant had been seen in Panama City the night of the murder, McKeithen asked the jailer to bring appellant into his office on December 22. After advising appellant of his rights, McKeithen confronted appellant with these discrepancies and asked him why he was in Panama City on the night of the murder. At first appellant denied having been in Panama City that night, but when pressed upon the matter, appellant later admitted he lied. According to McKeithen appellant started acting nervous so McKeithen asked him outright if he killed Carrier. Appellant started crying and said, "I didn't mean to shoot that man, I didn't mean to kill that man, it wasn't supposed to happen that way." McKeithen said that appellant kept crying and then said, "I think I should call my lawyer." McKeithen said that he then ceased his questioning and placed a telephone in front of appellant. McKeithen testified that appellant continued crying and kept saying, "I didn't mean to kill that man, it wasn't supposed to happen that way." McKeithen asserted that three or four minutes later he asked appellant if he wanted to talk about it and appellant said yes.
McKeithen said that he then took appellant into the office of Andy McKenzie, Jr., the chief investigator, and called in a secretary to transcribe appellant's confession. McKeithen asserted that he once again read appellant his rights. Appellant signed a waiver of rights form and answered McKeithen's questions, recounting the events surrounding the murder. Both the waiver of rights form and the confession were witnessed by McKeithen and McKenzie.
In response the defense tried to portray a slightly different picture of what happened. Appellant testified that during the month of December he regularly used "Placidyls, Dilaves (phonetic), acid, Valium, pot, coke, Cocaine." He claimed that while in jail he used Millaril, Thorazine, Phenobarbital and Nysoline which he acquired from other inmates. A corrections officer testified that some of these drugs were given to other inmates during this time. Appellant claimed he took three Thorazines the day he confessed and a Millaril the night before. He said he lied to McKeithen about not having taken any drugs so as not to cause his fellow inmates any trouble.
Appellant asserted that when McKeithen told him that someone had seen him in Panama City the night of the murder, he asked to call his lawyer. According to appellant, McKeithen looked at his watch and said that it was 3:30 on a Saturday afternoon and that he doubted very seriously if appellant could get in touch. Appellant claimed that McKeithen then grabbed his hand and said that the drugs had gotten appellant's mind all twisted and that he wanted to help. Appellant said that he confessed in hopes of obtaining help and that he did not realize that the confession would be used against him.
The defense then called as a witness Dr. James Edmund Hord, Jr., a clinical psychologist. Dr. Hord, who had interviewed and tested appellant, testified that appellant's ability to exercise independent judgment was diminished and that appellant was more susceptible than the normal person to responding to an authority figure.
After hearing arguments from both sides, the trial court stated that in the absence of any additional testimony at trial he would allow the statements to go to the jury. At trial neither side proffered any additional testimony concerning the voluntariness of the statements. The court ruled that the statements were freely and voluntarily given and were therefore admissible. Officer McKeithen was called to testify about appellant's incriminating statements. He repeated *727 his testimony about the events leading up to appellant's confession. He then read the confession to the jury. These statements were the only evidence linking appellant to the murder. The state's other witnesses merely corroborated appellant's statements concerning the stolen items and the location of the victim's body.
The defense did not present any evidence. The jury returned a verdict of guilty of first-degree murder.
At the sentencing phase of the trial the state did not present any additional evidence. The defense, however, called two witnesses, appellant's father and Dr. Hord. Appellant's father testified that his son had a nervous breakdown in the fifth grade, dropped out of high school to get married, divorced two and a half years later, underwent a personality change after the divorce, and remarried and divorced a second time. He further testified that after the first divorce appellant became unkempt, vulgar, and irresponsible. Dr. Hord testified as to the effect each of the drugs and narcotics appellant claimed to have been using regularly could have on one's personality. He said that at the time of the murder, appellant was probably suffering from extreme mental or emotional disturbance and was unable to conform his conduct to the requirements of law. On cross-examination, however, he conceded that he had not specifically inquired as to appellant's state of mind on the night of the murder.
The jury recommended a life sentence. The judge considered the recommendation but concluded that the jury was unduly influenced by the presence of appellant's family. The judge found as aggravating circumstances that the crime was committed during the commission of a felony, for pecuniary gain, and in a cold, calculated, and premeditated manner, and as mitigating circumstances that appellant had no significant history of prior criminal activity and that he was only twenty-one years old. Finding that the mitigating circumstances did not outweigh the aggravating, the judge imposed the death sentence.
Appellant raises two major points on appeal: whether the confession was admissible and whether the sentence of death is proper. For reasons set forth below we find that the confession was admissible and therefore affirm the conviction, but we reduce the death sentence to life imprisonment.
Appellant argues that his confession should not have been admitted into evidence because it was not freely and voluntarily given and because he did not knowingly waive his right to have counsel present. Appellant claims that his confession was not freely and voluntarily given because of his physical and mental condition and because of the hope he had that Officer McKeithen would help him.
An out-of-court confession is inadmissible where, at the time of the confession, the defendant lacked the capacity to exercise a free will or fully appreciate the significance of the statements because of the influence of drugs. Reddish v. State, 167 So.2d 858 (Fla. 1964). In this case, however, the evidence was in conflict as to whether appellant was actually under the influence of any type of drug at the time he confessed. Though appellant testified at the suppression hearing that he had taken three Thorazines just before he confessed, he also stated during his confession that he was not under the influence of any drugs and that he knew what he was doing. These latter statements were corroborated by Officer McKeithen's observations that appellant did not appear to be under the influence of any drugs. As for Dr. Hord's testimony concerning the effect extensive drug usage had on appellant's personality, the trial judge was not obligated to elevate these opinions to findings of fact.
With respect to appellant's contention that he was induced into confessing by Officer McKeithen's offer of help, Officer McKeithen admitted that he did tell appellant that he would try to help him. However, there is no evidence that this offer of help was specifically made in exchange for appellant's confession. When, during the confession, Officer McKeithen *728 asked appellant if he had been promised anything, or threatened or mistreated in any way, appellant answered, "No sir, you have been my friend." The mere fact that appellant regarded Officer McKeithen as his friend is insufficient to show that his confession was improperly induced. Halliwell v. State, 323 So.2d 557 (Fla. 1975); State v. Oyarzo, 274 So.2d 519 (Fla. 1973). We therefore conclude there was sufficient evidence to support the trial judge's findings that the confession was freely and voluntarily given.
We now address the more vexatious question of whether appellant knowingly waived his constitutional right to have counsel present during his confession. Recognizing the inherent coerciveness of custodial interrogation, the United States Supreme Court granted accused persons the right not to answer any questions without an attorney present in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court stated that if an accused person "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Id. at 444-45, 86 S.Ct. at 1612. The Court later characterized its holding in Miranda as fashioning a "rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease." Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979).
Both sides argue over whether appellant's statement, "I think I should call my lawyer," constitutes a request for an attorney. We find that the issue is not whether the statement itself constitutes such a request, but rather whether such a statement, given the context in which it is spoken, indicates a desire to see an attorney. In certain situations such a statement by an accused may indicate a desire to have an attorney present during questioning, in which case law enforcement officials must immediately cease questioning until the accused's attorney arrives. See People v. Traubert, 199 Colo. 322, 608 P.2d 342, 346 (Colo. 1980) ("Although the defendant's statement `I think I need to see an attorney' was neither `sophisticated' nor, perhaps, in a `legally proper form,' it was sufficient ... to put the police officers on notice that the defendant intended to exercise his constitutional rights to counsel."); State v. Blakney, 605 P.2d 1093, 1097 (Mont. 1979) (defendant's statement "maybe I should have an attorney" is "within the `indicates in any manner' language set out in Miranda as the requirement for an effective assertion of the right to counsel"), vacated on other grounds, 451 U.S. 1013, 101 S.Ct. 2999, 69 L.Ed.2d 384 (1981); Wentela v. State, 95 Wis.2d 283, 292, 290 N.W.2d 312, 316 (1980) ("the defendant's statement, `"I think I need an attorney,"' or `"I think I should see an attorney."' is a sufficient request for counsel"). In other situations such a statement may indicate nothing more than that the accused is merely expressing his ambivalence and is not sure whether or not he wants to see an attorney. See People v. Krueger, 82 Ill.2d 305, 45 Ill.Dec. 186, 412 N.E.2d 537 (1980) (defendant's remark variously described as "Maybe I ought to have an attorney," "Maybe I need a lawyer," and "Maybe I ought to talk to an attorney," was not a request for counsel), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 390 (1981). See also State v. Johnson, 318 N.W.2d 417 (Iowa), cert. denied, ___ U.S. ___, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982).
In this case the context in which appellant said he thought he should call his lawyer made it impossible for Officer McKeithen to determine whether appellant was requesting to see an attorney. While expressing a desire to speak to an attorney, which presumably indicates a wish not to answer any more questions, appellant was also readily confessing his guilt by repeatedly saying he did not mean to kill the man, thereby indicating a desire to continue talking to the police without the benefit of an attorney's presence. When a person expresses both a desire for counsel and a desire to continue the interview without counsel, further inquiry is limited to clarifying the suspect's wishes. Thompson v. *729 Wainwright, 601 F.2d 768 (5th Cir.1979); Nash v. Estelle, 597 F.2d 513 (5th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Here Officer McKeithen's asking appellant if he wanted to talk about it was meant to clarify appellant's wishes and was not meant to evoke an incriminating response. Therefore this question did not amount to an interrogation under Miranda. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); Barfield v. State, 402 So.2d 377 (Fla. 1981). By answering the question in the affirmative, appellant seemed to indicate that his earlier statement was not a request for counsel.
Even assuming appellant did request counsel, the record shows that he later knowingly and intelligently waived this right before being interrogated further. The United States Supreme Court has recently held that whether an accused has knowingly and intelligently relinquished his right to counsel is a separate determination from whether he has voluntarily consented to being questioned. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
[A]lthough we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, see North Carolina v. Butler, supra, [441 U.S. 369] at 372-376 [99 S.Ct. 1755 at 1756-1759, 60 L.Ed.2d 286], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when the accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.
Id. at 484, 101 S.Ct. at 1884 (footnote omitted). This stricter standard for showing that an accused has knowingly and intelligently waived a previous request for counsel is met when the accused voluntarily executes a written waiver. Witt v. State, 342 So.2d 497 (Fla.) cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). In this case appellant signed a written waiver after being readvised of his right to have counsel present and after he was given the opportunity to call his attorney. We therefore conclude there is sufficient evidence to support the finding that appellant knowingly and intelligently waived his right to have counsel present during his confession.
With respect to his sentence, appellant argues that section 921.141, Florida Statutes (1979), is ambiguous and should be construed so as to make a jury recommendation of a life sentence binding upon the trial judge. We find that the statute is not ambiguous. The statute specifically provides:
(2) ADVISORY SENTENCE BY THE JURY.  After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court... .
(3) FINDINGS IN SUPPORT OF SENTENCE OF DEATH.  Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death... .
§ 921.141(2), Fla. Stat. (1979). Appellant argues that these provisions concerning the advisory nature of the jury's recommendation apply only when the jury recommends a death sentence and that for the statute to be constitutional a jury recommendation of life must be binding upon the trial court. This argument is premised upon the contention that a jury recommendation of a life sentence is in fact a jury verdict finding a defendant not guilty of aggravated first-degree murder. Therefore, appellant argues, the trial judge's imposition of the death sentence after the jury has reached a verdict to recommend a life sentence deprives appellant of his constitutional right to be free from double jeopardy. There is no basis in support of appellant's premise that a jury recommendation of a sentence is the same as a jury verdict as to guilt or innocence. Florida's death penalty law completely separates these two functions by *730 establishing a bifurcated trial system. In the penalty phase of the trial, the judge must determine the sentence with the advice and guidance of the jury. Cooper v. State, 336 So.2d 1133 (Fla. 1976), cert. denied, 431 U.S. 925, 97 S.Ct. 2200, 53 L.Ed.2d 239 (1977). The statute clearly provides that the jury's recommendation is advisory only regardless of whether the recommendation is for a life sentence or for death. The statute's authorizing a trial judge to override a jury recommendation of a life sentence does not place a defendant in double jeopardy in violation of the state and federal constitutions. Johnson v. State, 393 So.2d 1069 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); Phippen v. State, 389 So.2d 991 (Fla. 1980); Douglas v. State, 373 So.2d 895 (Fla. 1979).
Next appellant claims that the trial judge erred by misapplying some of the aggravating and mitigating circumstances. He first argues that the court erred by doubling up the aggravating circumstances that the crime was committed during the commission of a felony and that it was committed for pecuniary gain. The trial judge premised this first aggravating circumstance on the finding that the crime was committed during the commission of a kidnapping. Because this finding was based upon kidnapping and not robbery, there was no improper duplication of aggravating circumstances. See Brown v. State, 381 So.2d 690 (Fla. 1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981).
Appellant also argues that the court erred in finding that the crime was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. See § 921.141(5)(i), Fla. Stat. (1979). We agree.
As we stated in State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943 [94 S.Ct. 1951, 40 L.Ed.2d 295] ... (1974), the aggravating circumstances set out in section 921.141 must be proved beyond a reasonable doubt. The level of premeditation needed to convict in the penalty phase of a first-degree murder trial does not necessarily rise to the level of premeditation in subsection (5)(i). Thus, in the sentencing hearing the state will have to prove beyond a reasonable doubt the elements of the premeditation aggravating factor  "cold, calculated ... and without any pretense of moral or legal justification."
Jent v. State, 408 So.2d 1024, 1032 (Fla. 1981), cert. denied, ___ U.S. ___, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982). "That aggravating circumstance ordinarily applies in those murders which are characterized as executions or contract murders, although that description is not intended to be all-inclusive." McCray v. State, 416 So.2d 804, 807 (Fla. 1982).
We find that the state failed to prove beyond a reasonable doubt that this murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The only direct evidence of the manner in which the murder was committed was appellant's own statements. When he first began incriminating himself, he repeatedly denied that he meant to kill Carrier. During his confession appellant explained that he shot Carrier because Carrier jumped at him. These statements establish that appellant had at least a pretense of a moral or legal justification, protecting his own life.
The trial judge expressed disbelief in appellant's statements because the victim was a quiet, unassuming minister and because appellant shot him not once but five times. Though these factors may cause one to disbelieve appellant's version of what happened, they are not sufficient by themselves to prove beyond a reasonable doubt that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In Mann v. State, 420 So.2d 578 (Fla. 1982), the defendant was convicted of killing a ten-year-old girl who died from a skull fracture and had been stabbed and cut several times. Despite the girl's youth and the nature of her injuries, we held that the trial court improperly found the murder to have been committed in a cold, calculated and premeditated *731 manner. We also held that this aggravating circumstance did not apply in McCray v. State, even though an eyewitness testified that the defendant approached the victim, yelled, "This is for you, mother fucker," and shot the victim three times in the abdomen. Thus, the unlikelihood that the victim threatened or jumped appellant and the appellant's shooting the victim five times are insufficient facts to prove premeditation beyond that necessary to sustain a conviction for premeditated murder. We therefore find that the court erred in finding that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
Appellant also argues that the trial court erred in not finding as mitigating circumstances that he was under the influence of extreme mental or emotional distress, under section 921.141(6)(b), and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, under section 921.141(6)(f). Appellant refers us to the testimony of Dr. Hord who asserted that due to extensive drug usage appellant was suffering from some mental or emotional disturbance and was unable to appreciate the criminality of his conduct or conform his conduct to the requirements of law. The trial court considered Dr. Hord's testimony both at the trial and at the suppression hearing but expressly found that these mitigating circumstances were not applicable. Although the trial court found that appellant was an indiscriminate user of a wide variety of drugs, it concluded that appellant's conduct in committing the robbery and kidnapping, fleeing from the scene of the crime, and disposing of the evidence conclusively showed that appellant was able to reason and understand the nature of his actions. The trial judge's conclusions were within his domain as the trier of fact. Smith v. State, 407 So.2d 894 (Fla. 1981), cert. denied, ___ U.S. ___, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982); Lucas v. State, 376 So.2d 1149 (Fla. 1979).
However, the jury may have given more credence to Dr. Hord's testimony than the trial judge in reaching its recommendation. The jury could have found that appellant was under mental or emotional disturbance and that he was unable to conform his actions to the requirements of law even though the trial court was not necessarily compelled to reach the same conclusions. Gilvin v. State, 418 So.2d 996 (Fla. 1982); Chambers v. State, 339 So.2d 204, 208 (Fla. 1976) (England, J., concurring). Thus the jury's recommendation of life sentence could have been based upon these statutory mitigating circumstances. Shue v. State, 366 So.2d 387 (Fla. 1978); Burch v. State, 343 So.2d 831 (Fla. 1977). The jury's recommendation of a life sentence could have also been partially based upon appellant's lack of significant criminal activity and upon his age. See McKennon v. State, 403 So.2d 389 (Fla. 1981); Stokes v. State, 403 So.2d 377 (Fla. 1981). In light of all these mitigating circumstances, there is a reasonable basis for the jury's recommendation of a life sentence.
Nevertheless the trial judge chose to override the jury's recommendation. The trial judge mentioned in his written findings that appellant
appeared before the jury as a clean-shaven, well-groomed twenty-one year old male supported by both his parents and other members of his family who occupied the front row bench of the Courtroom. The family members found it necessary to bring a small infant child into the Courtroom on more than one occasion in full view of the jury. The jury requested at one point, through the bailiff, that the infant child be removed from the Courtroom.
The trial judge stated that he seriously considered and weighed heavily the advisory opinion of life imprisonment, but concluded that
the emotional trauma experienced by the jury in seeing this young man in the presence of his family members suggests that the Court view the sentence in light of judicial experience and impose a sentence *732 based upon reasoned judgment. The Court is of the opinion that the facts suggesting a sentence of death for the commission of this murder is so clear and convincing that virtually no reasonable person could differ and the mitigating circumstances do not override or outweigh the aggravating circumstances.
We find that the trial judge's rejection of the jury's recommendation of life sentence is deficient in two respects. First, we note that the trial judge did not specifically find that the jury based its recommendation of life sentence upon emotional sympathy for appellant's family instead of upon the proven statutory mitigating circumstances. It is conceivable that the jury would have reached the same conclusion even if appellant's family had not been present at the trial. Secondly, we note that the trial judge relied upon the finding that the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, a finding which we have just held to be in error. Thus, we find that the facts suggesting a sentence of death are not so clear and convincing that virtually no reasonable person could differ. Tedder v. State, 322 So.2d 908 (Fla. 1975). We therefore vacate the sentence of death and remand this case with directions to impose a sentence of life imprisonment without eligibility for parole for the first twenty-five years.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON and McDONALD, JJ., concur.
ADKINS, J., concurs as to conviction, but dissents as to sentence.