[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 798 
Appellant, Manuel Valle, appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction and the death sentence.
On April 2, 1978, Officer Louis Pena of the Coral Gables Police Department was on patrol when he stopped appellant and a companion for a traffic violation. The events that followed were witnessed by Officer Gary Spell, also of the Coral Gables Police Department. Officer Spell testified that when he arrived at the scene, appellant was sitting in the patrol car with Officer Pena. Shortly thereafter, Spell heard Pena use his radio to run a license check on the car appellant was driving. According to Spell, appellant then walked back to his car and reached into it, approached Officer Pena and fired a single shot at him, which resulted in his death. Appellant also fired two shots at Spell and then fled. He was picked up two days later in Deerfield Beach. Following his jury trial, appellant was also found guilty of the attempted first-degree murder of Spell and after a non-jury trial, he was found guilty of possession of a firearm by a convicted felon.
 CONVICTION
Appellant makes several challenges to his conviction. Specifically, he challenges (1) the admission of his confession to this murder, (2) the method of selection of the grand and petit jury venires, and (3) the trial court's refusal to grant a mistrial on the basis of the prosecutor's alleged comments on his constitutional right to remain silent.
Appellant argues that his confession, which was admitted at trial, should have been suppressed because it was allegedly obtained in violation of his Miranda (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), rights. Shortly after appellant was arrested he was informed of his rights to remain silent and to have counsel present during questioning and the record shows that he waived those rights. Nonetheless, appellant argues that certain events following this initial free and voluntary waiver indicate that he subsequently invoked hisMiranda rights. We do not agree. The record reveals that pursuant to their established procedure, the Deerfield Beach Police Department contacted a public defender who spoke with appellant on the telephone. Later, when the interrogating officers arrived and informed appellant that they were there to conduct an interview, appellant stated that he had spoken with an attorney and she had advised him not to sign anything nor to answer any questions. The officer then stated that it was appellant's constitutional right to refuse to speak to him, that he did not have to speak if he did not want to, and *Page 799 
that he had come to Deerfield Beach hopefully to talk with him.
Even assuming that appellant's statement was somehow an invocation of his Miranda rights, it was at most an equivocal one, and interrogating officers are permitted to initiate further communications for the purpose of clarifying the suspect's wishes. Thompson v. Wainwright, 601 F.2d 768 (5th Cir. 1979);Nash v. Estelle, 597 F.2d 513 (5th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Thus, when the officer responded that "that was his constitutional right" and that he was there "hopefully to speak with him," he was not conducting further interrogation within the meaning of RhodeIsland v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), but was simply trying to determine whether or not the appellant wished to talk. Cf. Cannady v. State, 427 So.2d 723
(Fla. 1983) ("I think I should call my lawyer" held to be an equivocal request for counsel); Waterhouse v. State, 429 So.2d 301
(Fla.) (interrogation does not have to cease when accused states "I think I want to talk to an attorney before I say anything else" because he did not express a desire to deal with the police only through counsel), cert. denied, ___ U.S. ___, 104 S.Ct. 415, 78 L.Ed.2d 352 (1983). The right to counsel during questioning can be waived. Witt v. State, 342 So.2d 497 (Fla.),cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977). After the officer's innocuous reply, appellant's next statement that he had had several experiences with police officers in the past and that he had cooperated in the past and was willing to do so at that time, clearly shows that he voluntarily waived his Miranda rights. Even if he had previously asserted his rights, the law accords a defendant the opportunity to voluntarily change his mind and talk to police officers. Witt, 342 So.2d at 500. This statement, combined with the previous oral waiver, a later express written waiver, and the fact that at not time before, during, or after questioning did appellant request an attorney, convinces us that he made a voluntary, knowing and intelligent waiver of his Miranda
rights. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The trial judge was correct in admitting appellant's confession.
Appellant also contends that because the public defender instructed the Deerfield Beach officers not to question appellant and they agreed, that amounted to an invocation of his right to counsel. That is simply not true. The determination of the need of counsel is the defendant's prerogative. State v. Craig, 237 So.2d 737
(Fla. 1970). Thus, just as his attorney would have no right to waive appellant's right to counsel, without his consent, she likewise would have no right to unilaterally invoke that right.
Appellant argues next that his rights to due process and equal protection of the law were violated by substantial underrepresentation of Latin Americans, blacks, and women on the grand and petit jury venires. Appellant's grand jury was selected in accordance with chapters 70-1000, 57-550, and 57-551, Laws of Florida. Pursuant to these laws, circuit judges of the Eleventh Judicial Circuit of Florida submit the names of approximately five hundred individuals believed to be morally fit for jury service. A venire of ninety persons is then formed by a random selection.
This method of grand jury selection and the legislation authorizing grand jury selection have been consistently upheld by this Court as both constitutional and effective. See Dykman v.State, 294 So.2d 633 (Fla. 1973); Rojas v. State, 288 So.2d 234
(Fla. 1973), cert. denied, 419 U.S. 851, 95 S.Ct. 93, 42 L.Ed.2d 82 (1974); Seay v. State, 286 So.2d 532 (Fla. 1973),cert. denied, 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 77 (1974);Calvo v. State, 313 So.2d 39 (Fla. 3d DCA 1975), cert.denied, 330 So.2d 15 (Fla.), cert. denied, 429 U.S. 918, 97 S.Ct. 309, 50 L.Ed.2d 283 (1976). However, this method is constitutional only if there is a random selection of jurors by the circuit judges. *Page 800 
As we stated in State v. Silva, 259 So.2d 153, 160 (Fla. 1972):
 The tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. This does not mean, however, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community, for such complete representation would frequently be impossible. But it does mean that prospective jurors must be selected at random by the proper selecting officials without systematic and intentional exclusion of any of these groups.
(emphasis in original).
Appellant claims that the venire selection process used to select the grand jury which indicted him and prior grand juries was not random with regard to Latin Americans. The Supreme Court of the United States has stated that "in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. Casteneda v.Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).
Appellant, by his characterization of himself as a Latin American, has failed to prove that he belongs to an identifiable group. "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." Id. The term "Latin American" encompasses people from too many different countries and different cultural backgrounds and attitudes to constitute a single cognizable class for equal protection analysis. Accord, United States v. Rodriguez, 588 F.2d 1003
(5th Cir. 1979). See also United States v. Duran de Amesquita,582 F. Supp. 1326 (S.D.Fla. 1984) (holding that "hispanics" do not constitute a recognizable class). Appellant also urges a due process violation in the grand jury selection process. The first prong of the test for a due process violation requires that defendant show "that the group alleged to be excluded is a `distinctive' group in the community. . . ." Duren v. Missouri,439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). For the same reason, appellant has failed to prove that Latin Americans are a "distinctive" group in the community.
Appellant has also failed to prove that this method of grand jury selection was anything other than random with respect to blacks and women. In this case, the petit jury venire was randomly selected by computer from Dade County's voter registration list. Appellant argues that although section 40.01, Florida Statutes (1981), requires that all jurors be registered voters, it is nonetheless impermissible to rely exclusively upon voter lists as the source for random selection of veniremen. However, this Court has repeatedly upheld the constitutionality of section 40.01 against the argument that the selection of juries solely from voter lists was defective. See, e.g., Bryantv. State, 386 So.2d 237 (Fla. 1980); Johnson v. State, 293 So.2d 71
(Fla. 1974); Reed v. State, 292 So.2d 7 (Fla.), cert.denied, 419 U.S. 995, 95 S.Ct. 307, 42 L.Ed.2d 268 (1974);Jones v. State, 289 So.2d 385 (Fla. 1974). Appellant has failed to overcome the presumptive fairness of the source of the petit jurors.
Finally, we find no basis for quashing the indictment or setting aside appellant's conviction based on his challenge to the selection of the grand jury foreperson for the same reasons which we expressed in Andrews v. State, 443 So.2d 78 (Fla. 1983).
Appellant's final challenge to his conviction concerns testimony by the interrogating officer that when he asked the appellant the name of his employer during questioning appellant replied, "I'd rather not say." Appellant contends that this was an impermissible comment by the prosecutor on his exercise of his right to remain silent. *Page 801 
In Donovan v. State, 417 So.2d 674 (Fla. 1982), this Court reaffirmed the holding in Bennett v. State, 316 So.2d 41 (Fla. 1975), that it is reversible error to comment on an accused's exercise of his right to remain silent. However, we stated inDonovan that "[f]or Bennett to apply, the accused must have exercised his right to remain silent." 417 So.2d at 675.
Appellant refused to answer one question of the many that were asked of him after he had been given his Miranda warnings and had freely and voluntarily waived them. Similarly, in Ragland v.State, 358 So.2d 100 (Fla. 3d DCA), cert. denied, 365 So.2d 714 (Fla. 1978), the accused declined to answer one question of many. The court reasoned:
 While we are fully aware of the restrictions placed upon prosecutors on commenting upon a defendant's exercise of his or her constitutional right to remain silent, Doyle v. Ohio, 426 U.S. 610 [96 S.Ct. 2240, 49 L.Ed.2d 91] (1976); Bennett v. State, 316 So.2d 41
(Fla. 1975), the record before us conclusively demonstrates that appellant never invoked his Fifth Amendment right against self-incrimination. Rather, the record reveals that after being given his Miranda warnings, appellant freely and voluntarily conversed with the police. During this post-Miranda
lengthy conversation, appellant refused to answer one question of many. We do not believe that comment upon the failure to answer a single question was violative of appellant's constitutional right, when said constitutional right was not invoked.
Id. at 100 (citations omitted).
We agree with this reasoning and find it to be particularly applicable to this case. We, therefore, approve the holding inRagland and find that appellant did not invoke his Miranda
rights when he refused to answer one question. Again, the trial judge was correct in not granting a mistrial.
 SENTENCE
Appellant also makes several challenges to his sentence. These are: 1) that the trial judge erred by excluding a prospective juror, for cause, 2) that death may not be imposed where mitigating character evidence that appellant would be a model prisoner was excluded, 3) that the prosecutor made impermissible comments during closing arguments, 4) that the jury was not properly instructed on mitigating and aggravating circumstances, 5) that the trial court improperly found this murder to be especially heinous, atrocious, or cruel and 6) that the trial court refused to find certain statutory mitigating circumstances.
First, appellant argues that the sentence of death should be vacated because a juror who had serious reservations about the death penalty was excluded for cause in violation of Witherspoonv. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Nearly half of the venire at Witherspoon's trial was eliminated by challenges for cause under the authority of an Illinois statute which provided:
 In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same.
391 U.S. at 512, 88 S.Ct. at 1772. The jury in the state of Illinois at the time was given unlimited discretion to decide whether or not death was the "proper penalty" in a particular case. Id. at 519, 88 S.Ct. at 1775. The Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding verniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522, 88 S.Ct. at 1777 (footnote omitted).
After the Witherspoon decision, the Supreme Court and lower courts, this Court included, began to refer to language in footnotes 9 and 21 of Witherspoon as setting the standard for excluding jurors who were opposed to capital punishment. E.g.,Maxwell v. Bishop, 398 U.S. 262, 265, 90 S.Ct. 1578, 1580, 26 L.Ed.2d 221 (1970); *Page 802 Boulden v. Holman, 394 U.S. 478, 482, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433 (1969); Stewart v. State, 420 So.2d 862, 864 (Fla. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 366 (1983); King v. State, 390 So.2d 315, 319, cert.denied, 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (Fla. 1980). In footnote 21, the Court noted that jurors may be excluded for cause if they make it
 unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.
Id. 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. Similar language in footnote 9 provided:
 Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.
Id. 391 U.S. at 515 n. 9, 88 S.Ct. at 1773 n. 9. TheWitherspoon test has recently been rejected by the United States Supreme Court, however. In Wainwright v. Witt, ___ U.S. ___, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a Florida case, the Court clarified the "general confusion surrounding the application of Witherspoon." It held that the proper standard for excluding jurors opposed to capital punishment was set forth in a later case, Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In Adams the Court discussed its prior opinions dealing with juror exclusion and, in doing so, it noted the Witherspoon language in footnote 21. However, it did not apply the Witherspoon test; rather, the Adams Court concluded:
 This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the Court.
448 U.S. at 45, 100 S.Ct. at 2526 (emphasis added).
The Court noted a number of reasons why the Adams test is preferable over Witherspoon, among them, present-day capital sentencing juries are no longer invested with unlimited discretion in choice of sentence, the statements in theWitherspoon footnotes were dicta, and the Adams standard is in accord with the traditional reasons for excluding jurors. 105 S.Ct. at 851.
Applying the Adams standard of whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" to the facts of this case, we conclude that juror Ladd was properly excluded for cause.
An examination of the voir dire record in this case reveals that Ms. Ladd, the excluded juror, came forward after the initial voir dire was completed, and told the bailiff that she would like to say something that she was too nervous to say before. The following colloquy then occurred:
 THE BAILIFF: Miss Ladd wants to say something that she had forgotten about before. . . .
 MISS LADD: I don't know, but I was up here, I was like really nervous, and I was thinking of all the questions that you asked me. I wanted to say, like when I heard about the capital punishment and all that, I believe in it, I just don't know if I could do it. What you are saying about the second half of the trial and as far as could I make a decision and everything like that, I just don't believe that I personally could sentence anyone to death, and I just, since you were asking so many questions about the second part, I thought you might want to know that. . . . *Page 803 
 MISS LADD: You get so nervous.
 MR. ADORNO: Are you calm now or do you want a couple of more minutes?
 MISS LADD: I am as calm as I am going to be.
 MR. ADORNO: Please tell me what your opinion is as far as your concern? Are you concerned about the second phase?
 MISS LADD: Well, like I say, I believe in capital punishment, okay, and there's no problem there, but when I am really in here in seeing the defendant and everything and knowing what he looks like, I don't know if I personally could sentence anyone to death.
 MR. ADORNO: You believe in it, but you do not want to be a party to someone who potentially could be sentenced to death? That is basically what you are trying to tell me?
 MISS LADD: Basically.
 MR. ADORNO: This feeling that you have that you have expressed to us, is it of such a degree that first of all that it might affect you from the first part? In other words, we only get to the second part after the first part.
 MISS LADD: No, I don't think so.
 MR. ADORNO: So you could give me, on behalf of the State, a fair trial on the first part?
 MISS LADD: Yes.
 MR. ADORNO: Even though that is the first prerequisite? In other words, only if he is convicted of first degree murder is there the potential to have a jury recommend and the Court to sentence him to death.
 MISS LADD: Yes, the first part, you know, I can handle.
 MR. ADORNO: Let us go to the second part. Is it your feeling to such an extent that if I get up here in front of the twelve members of the jury and you are number twelve and I am telling you what I believe the evidence has shown and what the law is and what I believe is the appropriate recommendation as being death under the facts of the case, am I really only arguing to eleven? . . .
 MISS LADD: I couldn't do it.
 MR. ADORNO: So you are telling me that there is no way I am going to be able to present to you by way of evidence anything that will get you to recommend anything other than life and make you consider to vote for a recommendation of death?
 MISS LADD: I can't say there is nothing, you couldn't do, but I mean, you would have a lot to overcome before you would be able to convince me.
 MR. ADORNO: Okay. . . .
 MR. ROSENBERG: What I am asking you is if you went through the guilt or innocence phase and you on the jury voted guilty and go to the second phase and in the second phase what the Court is seeking from you is a recommendation, and that recommendation is between life or death, and the Court instructs you that there are other factors to take into consideration in returning that recommendation and the Court instructs you that the recommendation is to be made by a majority of you, the jury, and the Court instructs you that the recommendation is advisory only, that the Court may not follow that in the final sentence and judgment, but that the Judge may do what he wishes, would you be able to follow those instructions?
 MISS LADD: No, because I would still see it as me.
 MR. ROSENBERG: Are there any circumstances under which you would be able to return or recommend to the Court the death penalty?
 MISS LADD: You know, I can't think there are none, but offhand I can't think of anything. You know, I mean I don't know about the case or anything like that, but I just don't know if I could do it.
On at least six separate occasions juror Ladd stated that her feelings concerning capital punishment would impair her ability to follow the law as the judge instructed her. While the question and answer session may not reach the point where her bias was made "unmistakably clear," (although *Page 804 
we think it did), it did reach a point where the trial judge could have concluded her views would substantially impair her ability to act as an impartial juror. Further, we pay great deference to the trial judge's findings because he was in a position to observe the juror's demeanor and credibility, unlike we as a reviewing court. This is in accord with the Supreme Court's holding in part III of Witt. Although the Witt
Court was concerned with the deference to be paid a state trial court's finding in a petition for federal habeas corpus, the same applies on direct review. See 105 S.Ct. at 854.
In conclusion, we hold that the trial judge, aided by his ability to observe the demeanor and clarity of Ms. Ladd's responses, was properly entitled to exclude her for cause.
Appellant's next point on appeal concerns certain character evidence offered by him for the purpose of mitigation. This character evidence consisted of the proffered testimony of certain corrections consultants and prison psychiatrists who would testify that if appellant were given a sentence of life imprisonment rather than death, he would be a "model prisoner." Appellant relies on our decision in Simmons v. State, 419 So.2d 316
(Fla. 1982), to sustain his position that this testimony should have been admitted. That reliance is misplaced, however. In Simmons, the proffered testimony was that of a psychiatrist who stated that unlike some violent criminals with more severe character disorders, appellant had the capacity to be rehabilitated. Id. at 317-18. We held that the trial judge erred in not allowing this testimony before the jury. Unlike the proffered testimony in Simmons, there was no testimony by the expert witnesses here that appellant had the capacity to be rehabilitated, only that he would be a model prisoner while in prison. It does not necessarily follow that if one behaves while he is in prison that he will behave outside of prison.
Competent evidence of this same type had already been heard by the jury. Eurvie Wright, special administrator of the Dade County Corrections and Rehabilitation Department, was a bureau supervisor of the Dade County Stockade in 1975 when appellant was an inmate there. Wright, who was a rehabilitation officer, testified that during the time appellant was in prison, he was a model prisoner and was rehabilitated.
The arguments presented here are similar to those which this Court considered and rejected in Stewart v. State, 420 So.2d 862
(Fla. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 366 (1983). In Stewart, there was evidence from three psychiatrists that the defendant was competent to stand trial. On the day the sentencing proceedings began, defense counsel moved for a continuance and appointment of a psychiatrist and psychologist, claiming their testimony was necessary to demonstrate certain mitigating circumstances set forth in section921.141(6)(b), (e), and (f), Florida Statutes (1981). Stewart argued on appeal that the trial court's denial of the motion prevented the unlimited consideration of mitigating evidence as mandated by Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). We found that another psychiatric examination would be merely cumulative and the trial court in no way limited the presentation or consideration of mitigating evidence. We then held that the trial court did not abuse its discretion by refusing to grant the continuance. Id. 420 So.2d at 864. We believe, then, that there was substantial, competent evidence presented to the jury on the issue of appellant Valle's rehabilitation; thus, as in Stewart, any other evidence on this issue was merely cumulative.
As for appellant's contention that the trial court erred in not finding the statutory mitigating circumstances set forth in sections 921.141(6)(b) and (f), neither the jury nor the trial court is compelled to find mitigating circumstances as long as they consider them. Hargrave v. State, 366 So.2d 1 (Fla. 1978),cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979). *Page 805 
Appellant also contends that the prosecutor made several comments during his closing arguments that amounted to fundamental error, specifically, that the appellant might be paroled if sentenced to life imprisonment, and that a life sentence would be unfair to the victim's family.
The record shows that, during closing argument, the prosecutor made the following remarks:
 It seems the argument is going to be that 25 years is a real long time. Think about it. If you multiply that by the hours, by the days, by 25 years, that he will be there, he won't be out until he is 55.
 Well, think about that argument. At least he has hope, even at 55, to get out. His wife, his child, they all have hope that some day they will see him again.
 Alana Pena will never see Lou Pena again, nor his parents, nor his children. They will never spend a 55th birthday with Lou Pena, and if Mr. Rosenberg comes up and he begins to describe electrocution to you, I agree it is not very pleasant, but if he does, and you should consider that, which I believe you should not, and he describes the last meal and the last walk down the hallway to the room, think about it.
 This man has had a chance to prepare, to make his peace with his family and with God. Not on April 2nd, 1978, did Lou Pena ever get a chance to do this.
 When he left his home on that day, I am sure he did not think that that would be the last time he ever left, and I am sure when he kissed his wife and children good-bye, I am sure he did not think that would be the last one.
The remarks concerning the defendant's possibility for parole do not rise to the level of prosecutorial overkill which we determined in Teffeteller v. State, 439 So.2d 840 (Fla. 1983),cert. denied, ___ U.S. ___, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984), required a new sentencing. Rather, they are more like the remarks made by the prosecutor in Harris v. State, 438 So.2d 787
(Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984), which we held, while they should not have been made, were not so prejudicial as to require a mistrial. Similarly, the remarks concerning the victim's family, while improper, were not so prejudicial as to have influenced the jury to render a more severe recommendation than it would have otherwise and is therefore not reversible error. Johnson v.State, 442 So.2d 185 (Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 2182, 80 L.Ed.2d 563 (1984). See also Blair v. State,406 So.2d 1103 (Fla. 1981).
Appellant also contends that the trial judge and the jury improperly considered nonstatutory aggravating circumstances, to wit, the appellant's lack of remorse, the victim's pain and suffering, and the victim's occupational status. There is no indication in the record that the trial judge considered either the appellant's lack of remorse or the victim's occupation as a police officer in his finding of aggravating factors. As for appellant's claim that the jury improperly considered nonstatutory aggravating factors, the jury is presumed to follow the judge's instructions as to the evidence it may consider.Grizzell v. Wainwright, 692 F.2d 722, 726-27 (11th Cir. 1982),cert. denied, 461 U.S. 948, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983). Contrary to appellant's argument, the jury was properly instructed in this instance. This Court has consistently held that the standard jury instructions on aggravating and mitigating circumstances, which were given in this case, are sufficient and do not require further refinements. Vaught v. State, 410 So.2d 147, 150 (Fla. 1982); Demps v. State, 395 So.2d 501, 505 (Fla.), cert. denied, 454 U.S. 933, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981). Thus, since the jury was properly instructed in this instance as to the evidence which it may have considered, there is nothing to indicate that they relied on the prosecutor's remarks in closing argument. See Shriner v. Wainwright, 715 F.2d 1452
(11th Cir. 1983).
Appellant's final argument on appeal is that the trial judge erred in finding that this murder was especially heinous, atrocious, *Page 806 
and cruel. See § 921.141(5)(h), Fla. Stat. (1983). In addition to this aggravating circumstance, the trial judge also found that two other aggravating factors were applicable to this murder, i.e., that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, section 921.141(5)(e), Florida Statutes (1983), and the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, section 921.141(5)(g), Florida Statutes (1983). These findings are not challenged on appeal to this Court. The written sentencing order also states that the trial judge considered all the evidence of statutory and non-statutory mitigating circumstances, and specifically found that none were applicable to this case. We have reviewed that finding and there was no error.
We need not consider whether this aggravating factor is present, then, because even without it there are two aggravating factors that are properly applied here. When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided in section 921.141(6), Florida Statutes (1983). State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
Accordingly, the conviction and sentence are affirmed.
It is so ordered.
BOYD, C.J., and OVERTON, ALDERMAN and McDONALD, JJ., concur.
EHRLICH, J., concurs with an opinion, in which OVERTON, J., concurs.
SHAW, J., concurs in result only.