616 So.2d 971 (1993)
Terance VALENTINE, Appellant,
v.
STATE of Florida, Appellee.
No. 75985.
Supreme Court of Florida.
April 15, 1993.
*972 James Marion Moorman, Public Defender, and Douglas S. Connor, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and Candance M. Sunderland, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Valentine appeals his convictions for first-degree murder, attempted first-degree murder, two counts of kidnapping, grand theft, and burglary, and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse the convictions and vacate the sentences.
Livia Romero married Terance Valentine while she was a teenager in Costa Rica and the couple emigrated to the United States in 1975, settled in New Orleans, and adopted a child. After seeking to divorce Valentine in 1986, Romero married Ferdinand Porche and the family moved to Tampa, where they began receiving telephoned threats from Valentine. On September 9, 1988, Valentine armed himself, forced his way into the family's home, wounded Porche, drove both Romero and Porche to a remote area and shot them. Romero survived and immediately told police Valentine was her assailant.
Several weeks after being released from the hospital, Romero began receiving telephone calls from Valentine, which she taped using a telephone and recorder supplied by police. Valentine was eventually arrested and charged with armed burglary, kidnapping, grand theft, first-degree murder and attempted first-degree murder. His motion to suppress a conversation taped on November 7 was denied; an edited tape was played for the jury; and the court subsequently declared a mistrial after the jury was unable to reach a unanimous verdict.
The entire fifteen-minute tape was played for the jury on retrial. Additional evidence included Romero's testimony and that of Porche's neighbor, who testified that on September 9 he saw two men sitting in a faded red and white or red and gray Ford Bronco parked opposite his house between 1 and 3 p.m. Nancy Cioll, a friend of Valentine's and Romero's, testified that about two weeks after the killing, Valentine visited her driving a maroon, gray and black Ford Bronco. She said he confessed to the shootings, demonstrated how he had shot Romero, and said he had made a mistake leaving Romero alive. Valentine's alibi defense that he was in Costa Rica at the time of the shootings was disbelieved by the jury and he was convicted on all counts. During the penalty phase, Valentine represented himself and called his daughter and two friends to testify on his behalf. The jury recommended death by a ten to two vote and the judge imposed the *973 death penalty, finding three aggravating[1] and three mitigating[2] circumstances.
Although Valentine raises a number of issues, a single claim is dispositive. During voir dire after the State moved to peremptorily strike the first two African-Americans in the venire, defense counsel objected, giving specific grounds:
Your Honor, at this time, I would like to make an objection to the fact that the State has peremptorily challenged two of the only blacks we have on the panel so far, which is Ms. Glymph and Mr. Aldridge.
I think if the Court will recall the voir dire questioning of both of those, that it indicates there's a strong likelihood challenges were exercised solely on the basis of race. As far as Ms. Glymph is concerned, her testimony was the fact that she was a victim of a crime, a burglary, her nephew is on the police department in South Carolina, she's a manager of a doctor's office. There's nothing, absolutely nothing to indicate that she has any kind of a bias, that there would be any reason that she would not be favorable to the State's case.
As far as Mr. Aldridge is concerned, he testified he was a retired individual. He did indicate that he could recommend the death penalty under certain circumstances. He would be willing to listen to all the circumstances. He was not opposed to the death penalty, and the State did not examine him at length as to any other reason.
I don't believe there's any racially neutral reason whatsoever for the exclusion of those two prospective jurors. I would ask that the Court direct the State to give clear and reasonably specific racially neutral explanations for excluding those two jurors.
I don't know if the record reflects it yet, but Mr. Valentine is black. This is a case where the defendant is black, and I believe the evidence will eventually show the victims are Latin Americans and also Black.
In response, the court simply noted that there were a total of forty-nine prospective jurors in the venire, seven of whom were African-American,[3] and then ruled: "The Court finds that the Defense has not made a proper showing that the State, at this time, is exercising its peremptory challenges based solely on group bias." Valentine now claims that the court erred in failing to inquire into the State's reasons for excluding the two African-Americans.
This Court set forth the protocol for determining whether a peremptory challenge is unlawfully exercised on racial grounds in State v. Neil, 457 So.2d 481 (Fla. 1984):
A party concerned about the other side's use of peremptory challenges must make a timely objection and demonstrate on the record that the challenged persons are members of a distinct racial group and that there is a strong likelihood that they have been challenged solely because of their race. If a party accomplishes this, then the trial court must decide if there is a substantial likelihood that the peremptory challenges are being exercised solely on the basis of race. If the court finds no such likelihood, no inquiry may be made of the person exercising the questioned peremptories. On the other hand, if the court decides that such a likelihood has been shown to exist, the burden shifts to the complained-about party to show that the questioned challenges were not exercised solely because of the prospective jurors' race.
Id. at 486 (footnote omitted).
We subsequently declined to devise a brightline test for determining when the *974 objecting party has made an adequate initial showing of a "likelihood" of discrimination and instead affirmed the spirit and intent of Neil that the objector must be given broad leeway and any doubts resolved in his or her favor:
We nevertheless resist the temptation to craft a brightline test... . Instead, we affirm that the spirit and intent of Neil was not to obscure the issue in procedural rules ... but to provide broad leeway in allowing parties to make a prima facie showing that a "likelihood" of discrimination exists.... [W]e hold that any doubt as to whether the complaining party has met its initial burden should be resolved in that party's favor. If we are to err at all, it must be in the way least likely to allow discrimination.
State v. Slappy, 522 So.2d 18, 21-22 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). In other words, unless a court can cite specific circumstances in the record that eliminate all question of discrimination, it must conduct an inquiry.
The primary purpose for this rule deferring to the objector is practical  it is far less costly in terms of time and financial and judicial resources to conduct a brief inquiry and take curative action during voir dire than to foredoom a conviction to reversal on appeal. When the vast consequences of an erroneous ruling  i.e., an entire new trial  are balanced against the minor inconvenience of an inquiry  i.e., a delay of several minutes  Slappy's wisdom is clear. To give this rule effect and minimize the risk of reversal, we recently held in State v. Johans, 613 So.2d 1319 (Fla. 1993), that once a party makes a timely objection and demonstrates on the record that the challenged persons are members of a distinct racial group, the trial court must conduct a routine inquiry.
Because our holding in Johans is prospective only  applying to jury selections taking place after our decision in Johans was filed  we review the present case under conventional Neil/Slappy analysis. We note that both prospective jurors Aldridge and Glymph were questioned on a number of matters during voir dire. Aldridge stated that although he would not want to be the one to say that a person be electrocuted, he personally was not opposed to the death penalty and would recommend it if the aggravating circumstances outweighed the mitigating. He added that he would hold the parties to their burdens of proof and that he had no relatives or friends in law enforcement. Juror Glymph testified that she had been a victim of a burglary; she was satisfied with police handling of it; her nephew works for the sheriff; she is acquainted with two judges; she has no problem with the death penalty; she belongs to the PTA and Orchid Club; and she could follow the law in recommending death.
This discourse provides no objective basis whatsoever for the State's striking of the two prospective jurors, independent of their race. In fact, Juror Glymph's statements would appear to make her a preferred juror in the eyes of many prosecutors  we note that two white women prospective jurors who had been similarly burglarized were seated. Not only did the trial court fail to cite record evidence eliminating all question of discrimination, it cited none. Under our holding in Slappy, this constitutes reversible error.
Although the above issue is dispositive of this case, we briefly evaluate several additional claims to assist the trial court in the event of retrial. In the context of this case, we find no merit to the following claims: The State failed to obtain the daughter's consent prior to recording the family's telephone calls; and Romero's testimony concerning the Bronco was inadmissible hearsay. The following claims have merit: The daughter's taped conversation was inflammatory and irrelevant; Romero's taped statement that Valentine was a drug dealer was irrelevant; the daughter's prior inconsistent statement should not have been admitted without a proper foundation; the sentencing order is flawed by the court's failure to conduct an independent weighing of aggravating and mitigating circumstances; and the jury was improperly instructed on the aggravating circumstance *975 of heinous, atrocious or cruel per Espinosa v. Florida, ___ U.S. ___, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992).
Based on the foregoing, we reverse Valentine's convictions and vacate his sentences. We note that reversal would have been unnecessary if the trial court had simply followed Slappy's clear directive and resolved all doubt in favor of the objector. See Slappy, 522 So.2d at 22. Our holding in Johans will hopefully minimize such costly and frustrating errors  where a lengthy and expensive trial is foredoomed at its very beginning for lack of a five-minute inquiry.
It is so ordered.
BARKETT, C.J., and OVERTON, SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
McDONALD, J., dissents with an opinion.
McDONALD, Justice, dissenting.
I disagree that the trial judge's determination that the jury strikes were not based on racial reasons should be disturbed. In doing so the majority is simply second guessing on a cold record.
I agree with the other assessments of claimed error.
NOTES
[1] 1) Previous conviction of a violent felony, i.e., the contemporaneous attempted murder; 2) commission during the course of a kidnapping; and 3) both cold, calculated and premeditated, and heinous, atrocious or cruel. See § 921.141, Fla. Stat. (1987).
[2] 1) No significant history of prior criminal activity; 2) the defendant's age of forty-one; 3) defendant supported his family, was a good father, had not mistreated his wife before, was a well-known basketball player and coach who took an interest in children, and was known to be a nonviolent and close family man. See id.
[3] Of the forty-nine prospective jurors, seven were African-American. Of the seven, one was struck for cause, two peremptorily challenged, and one seated.