644 So.2d 1000 (1994)
Aileen Carol WUORNOS, Appellant,
v.
STATE of Florida, Appellee.
No. 79484.
Supreme Court of Florida.
September 22, 1994.
Rehearing Denied November 16, 1994.
*1002 James B. Gibson, Public Defender and Christopher S. Quarles, Asst. Public Defender, Daytona Beach, for appellant.
*1003 Robert A. Butterworth, Atty. Gen. and Margene A. Roper, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Aileen Carol Wuornos. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On December 1, 1989, a deputy in Volusia County discovered an abandoned vehicle belonging to Richard Mallory. His body was found December 13, several miles away in a wooded area. Mallory had been shot several times, but two bullets to the left lung were found to have caused hemorrhaging and ultimately death. The medical examiner also determined that Mallory had been drinking at the time of his death, though it was not clear whether he was legally intoxicated.
Tyria Moore and Aileen Wuornos lived together as lovers for about four and a half years. Moore worked as a maid, while Wuornos worked as a prostitute along Central Florida highways. Wuornos drank substantial amounts of alcoholic drink while working as a prostitute and at other times, and she also carried a gun for protection.
On December 1, 1989, after several days working along the roadways, Wuornos returned to a Volusia County motel where she and Moore were living. Wuornos was intoxicated and told Moore that she had shot and killed a man early that morning. She said she sorted through the man's things, keeping some, discarding others. Wuornos said she abandoned the man's car near Ormond Beach, and left his body in a wooded area.
Several months later, Moore began seeing media reports that law officers were looking for two women suspected of being involved in a series of murders. Moore became afraid, left Wuornos, and returned to her home up north. Florida law officers later contacted her in Pennsylvania, and Moore agreed to return to Florida in an attempt to clear herself of any wrongdoing. Moore then tried to extract a confession from Wuornos, ultimately succeeding.
Wuornos gave taped confessions to a Volusia sheriff's investigator. When she first indicated she wanted to talk to law officers, she also expressed a desire to speak with an attorney. A lawyer from the public defender's office was summoned, who strongly advised Wuornos against confessing both before and during her comments to law officers. She stated that she did not want to follow her attorney's advice and then made her confession.
The different statements Wuornos made, however, are inconsistent with each other on major points. In the earliest confession to law officers, Wuornos said that Mallory picked her up while she was hitchhiking, and they later went into a secluded wooded area to engage in an act of prostitution. She and Mallory then began disagreeing because he wanted to have sex after only unzipping his pants. Wuornos said she felt Mallory was going to "roll her" (take her money) and rape her. At this point, she grabbed a bag in which she kept a gun, and the two began struggling over possession of the bag.
Wuornos said she prevailed, pointed the gun at Mallory, and said: "You son of a bitch, I knew you were going to rape me."
Wuornos said that Mallory responded: "No, I wasn't. No, I wasn't."
At this point, Wuornos told law officers she shot Mallory at least once while he still was sitting behind the steering wheel. Mallory then crawled out the driver's side and shut the car door. At some point he was able to stand again. Wuornos said she ran around to the front of the car and shot Mallory again, which caused him to fall to the ground. While he was lying there, Wuornos said she shot him twice more, then went through his pockets, and finally concealed the body beneath a scrap of rug. Later, she drove off in the victim's car.
Wuornos also told law officers she had given Moore inconsistent stories about what had happened. In one version, Wuornos stated she told Moore that she had found a dead body hidden under a scrap of rug in the woods. In another, she confessed to the killing.
*1004 Wuornos' confession changed considerably in later versions. Wuornos later said she had offered to perform an act of prostitution with Mallory and that he then drove to an isolated area. There, the two drank, smoked marijuana, and talked for about five hours. Wuornos described herself as "drunk royal."
Around 5 a.m., Wuornos disrobed to perform the act of prostitution. She asked Mallory to remove his clothes, but he said he only wanted to unzip his pants and didn't have enough money to pay her fee. Wuornos said she then went to retrieve her clothes, but Mallory whipped a cord around her neck and threatened to kill her "like the other sluts I've done." He then tied her hands to the steering wheel, Wuornos said.
According to Wuornos's later version of the case, Mallory violently raped her vaginally and anally, and took pleasure from Wuornos' cries of pain. Afterward, she said that Mallory cleaned blood from his penis with rubbing alcohol, then squirted alcohol onto her torn and bloody rectum and vagina.
Wuornos said Mallory eventually untied her and told her to lie down. Believing he intended to kill her, Wuornos said she began to struggle. Mallory, she said, told her, "You're dead, bitch. You're dead." At this juncture, Wuornos said she found her purse and removed her gun. Mallory grabbed her hand, and the two began fighting for the gun's possession. Wuornos won the fight, then shot Mallory. Wuornos said Mallory kept coming at her despite her warnings, so she shot him two more times.
Wuornos also confessed that she took some of Mallory's property and pawned it. Some of his property later was found in a rented warehouse unit used by Wuornos. More than a year later, she took the murder weapon and threw it into Rose Bay south of the motel where she was staying at the time. Moore later showed law officers where to find the gun. Grooves in the gun were similar to markings found on the fatal bullets, though an expert testified that the particular grooves were fairly common and could be found in other weapons.
Wuornos said that she had begun her career as a prostitute at age 16. At about age 20, she settled in Florida, and began working as a highway prostitute at least four days of the week. Her job was dangerous, she said. On some occasions she had been maced, beaten, and raped by customers.
At trial, the State was allowed to introduce similar crimes evidence about Wuornos' alleged involvement in several other murders. These were:
Humphreys. On September 12, 1990, officers in Marion County found the body of Charles Richard Humphreys. The body was fully clothed, and had been shot six times in the head and torso. Humphreys' car was found in Suwannee County.
Siems. In June 1990, Peter Siems left Jupiter, Florida, heading for New Jersey. Law officers later found Siems' car in Orange Springs on July 4, 1990. Witnesses identified Tyria Moore and Aileen Wuornos as the two persons seen leaving the car where it ultimately was found. A palm print on the interior door handle matched that of Wuornos. Siems' body has never been found.
Antonio. On November 19, 1990, the body of Walter Jeno Antonio was found near a remote logging road in Dixie County. His body was nearly nude, and had been shot four times in the back and head. Law officers found Antonio's car five days later in Brevard County.
Burress. On August 4, 1990, law officers found the body of Troy Burress in a wooded area along State Road 19 in Marion County. The body was substantially decomposed, but evidence showed it had been shot twice.
Spears. On June 1, 1990, officers discovered the body of David Spears in a remote area in Southwest Citrus County. Except for a baseball cap, Spears was nude. He had died of six bullet wounds to the torso.
Carskaddon. On June 6, 1990, officers discovered the body of Charles Carskaddon in Pasco County. The medical examiner found nine small caliber bullets in his lower chest and upper abdomen.
For the five bodies that were recovered, the bullets all bore similar characteristics. As noted above, the grooving pattern was *1005 fairly common and could have come from weapons other than the one Wuornos used.
A variety of items that once belonged to Mallory were traced to Wuornos. A camera from Mallory's automobile was found inside the rented warehouse unit, which was opened with a key taken from Wuornos' possession. Wuornos had rented the unit under an alias. Other items from Mallory's car had been pawned or given away to others by Wuornos.
The trial jury found Wuornos guilty of first-degree murder and armed robbery with a firearm.
Her penalty phase commenced January 28, 1992. Three defense psychologists concluded that Wuornos suffered borderline personality disorder at the time of her crime, resulting in extreme mental or emotional disturbance. The psychologists said her ability to conform her conduct to the requirements of the law was substantially impaired, and that Wuornos exhibited evidence of brain damage.
One expert, Dr. Krop, testified that Wuornos lacked impulse control and had impaired cognition. Dr. Toomer said that Wuornos believed she was in imminent danger at the time of the murder, and that the remorse she exhibited revealed she did not suffer antisocial personality disorder.
The State's expert psychologist, Dr. Bernard, agreed that Wuornos had borderline personality disorder, but also found that she suffered antisocial personality disorder. Dr. Bernard also agreed that she had an impaired capacity and mental disturbance at the time of the crime, but believed the impairment was not substantial and the disturbance was not extreme. Dr. Bernard agreed there was evidence of nonstatutory mitigating evidence including Wuornos' mental difficulties, alcoholism, disturbance, and genetic or environmental deficits.
In the penalty phase, the defense introduced evidence about Wuornos' background. Her parents were divorced when she was born, and her biological father hanged himself in prison, where he was serving time for rape and kidnapping. Her mother abandoned her, and Wuornos was adopted by her grandparents. However, her grandfather was an alcoholic, and later committed suicide. Her grandmother also drank a good deal and died of a liver disorder. Wuornos' brother died of cancer at age 21.
During junior high, Wuornos began exhibiting hearing loss, vision problems, and trouble in school. Her IQ was established at 81, in the low dull-normal range. School officials urged that Wuornos receive counseling and tried to improve her behavior by administering a mild tranquilizer.
At about age 14, Wuornos was raped by a family friend. She waited six months before revealing that she was pregnant, and her grandparents blamed her for the pregnancy. Her grandfather later forced her to give up the child for adoption.
Some evidence indicated that Wuornos' life with her grandparents was physically and verbally abusive. Wuornos left home, but when she tried to return her grandfather refused to take her back. She then went onto the streets and began a life of prostitution and alcohol and drug abuse.
The State introduced a rebuttal witness as to Wuornos' background. Wuornos biological uncle (also her adoptive brother), Barry Wuornos, said that his family had a "normal lifestyle" and was a "straight and narrow family." Barry acknowledged that his father (Aileen's biological grandfather) "laid down rules" but was someone you could look up to. Barry said he never saw his father beat Aileen, although the girl sometimes was spanked; and the discipline may have become more "tight" when Aileen was around 10 years of age. Barry agreed that Aileen's biological father was abusive and "a criminaltype."
The jury recommended death by a vote of 12 to 0. The trial court found five aggravating circumstances and one mitigating factor,[1] then sentenced Wuornos to death on the *1006 murder charge and ten years for the armed robbery.
As her first issue, Wuornos argues that certain information and documents were withheld from her during pretrial discovery, contrary to the rule of law in Richardson v. State, 246 So.2d 771 (Fla. 1971), and its progeny. Wuornos contends that she was not told that law officers had interviewed and taped a conversation with Jacqueline Davis, Mallory's girlfriend. Wuornos believes that this testimony would have established a prior violent disposition toward women when Mallory was in his late teens.
The record, however, sufficiently supports the conclusion that Davis's name and her taped statement had been furnished to Wuornos' original defense team within the time limits of the Richardson rule.[2] In any event, the trial court allowed the defense to proffer Davis's testimony: Other than hearsay, Davis stated that to her personal knowledge Mallory always had been gentle toward women. Moreover, after the proffer of Davis's testimony, the defense chose to rest its case and not call Davis to the stand in the presence of the jury. This happened even though the trial court said it would permit her to testify within the requirements of the evidence code. We conclude that there was no actual discovery violation with regard to Davis's testimony, and hence there was no need for a Richardson hearing.
On a related point, Wuornos argues that law enforcement witnesses brought to the witness stand notes outlining their recollection of the events surrounding the murder investigation. These notes were afforded to defense counsel immediately prior to the testimony in question. Wuornos concludes that this procedure also violates Richardson. We find that it does not. The notes in question constitute the kind of "reports" or "summaries" mentioned in State v. Gillespie, 227 So.2d 550, 556 (Fla. 2d DCA 1969), which are not discoverable unless and until they actually are used to refresh a witness's memory at trial.
Wuornos also complains that she was not afforded proper pretrial discovery regarding evidence the State intended to introduce pursuant to the rule of law established in Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). This evidence related to some of the other murders with which Wuornos was charged. On this point, the trial court concluded that Wuornos' counsel either had been afforded the discovery in question or had failed to exercise opportunities to review or copy the materials. The record provides sufficient support for this conclusion. While Richardson affords much to the defense, it does not mean the State must perform the defense's discovery for it. In sum, we find no discovery violation here that would have required a Richardson hearing in the first instance.
Second, Wuornos argues that the extensive Williams rule evidence presented by the State unlawfully prejudiced her case. While it may be true that similar crimes evidence should not be used if it amounts to needless "overkill," see United States v. Beechum, 582 F.2d 898 (5th Cir.1978), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), we cannot say that such was the case here. Wuornos' own testimony at trial portrayed her as the actual victim here. She claimed Mallory viciously abused her and then engaged in actions suggesting he intended to kill her. This was the only eye-witness testimony of the actual murder and, within itself at least, was consistent.[3] Had the jury believed this testimony, it might have concluded that Wuornos lacked premeditated intent and thus should be convicted of some lesser degree of homicide or acquitted.
In other words, the State relied on the similar crimes evidence to rebut Wuornos' claims regarding her level of intent and *1007 whether she had acted in self-defense. This was a proper purpose under the Williams rule. Williams v. State, 621 So.2d 413 (Fla. 1993); Goldstein v. State, 447 So.2d 903, 906 (Fla. 4th DCA 1984); Villar v. State, 441 So.2d 1181 (Fla. 4th DCA 1983), review denied, 451 So.2d 851 (Fla. 1984).
We also do not agree with Wuornos' contention that the nature of the similar crimes evidence was so disturbing that its relevance was outweighed by the potential for prejudice. See § 90.404(2)(a), Fla. Stat. (1989). All evidence of a crime, including that regarding the murder in question, "prejudices" the defense case. The real question is whether that prejudice is so unfair that it should be deemed unlawful. We cannot say that this was the case here. The nature of the various crimes was relevant in establishing a pattern of similarities among the homicides. This, in turn, was relevant to the State's theory of premeditation and to rebut Wuornos' claim that she was the one attacked first. Relevance clearly outweighs prejudice here; and the similar crimes evidence was fair within the requirements of the law.
Wuornos urges that the Williams rule evidence here also contained improper victim impact material. This included information about the religious activities of some victims, and the fact that one victim was a retired police officer, among other details. While some of the evidence at first blush may appear to have exceeded what is proper under Burns v. State, 609 So.2d 600 (Fla. 1992), we also find that any possible error was harmless beyond a reasonable doubt in light of the entire record. This is true as to both the guilt and penalty phases. Id. at 606-07. Much of the information was anecdotal material associated with matters that clearly were relevant. Other details, such as the religious activities of one victim, were directly relevant because one of Wuornos' confessions identified one victim as "the Christian guy." When a confession opens the door to such information about the victim, there is no Burns violation.
As her third issue, Wuornos contends that law officers improperly tricked her into confessing and in doing so also violated her right to counsel. It is true that Wuornos' former lover, Tyria Moore, encouraged Wuornos to confess and did so in part because of Moore's own fears of being prosecuted as an accomplice. The exchanges between Wuornos and Moore may have contained misstatements and exaggerations by both parties, but this is consistent with the emotional nature of the exchanges. Viewed as a whole, we cannot agree that Wuornos' will was overborne by any official misconduct. She freely waived her rights and confessed, contrary to advice of counsel both before and during the first confession and later. For the same reason, there was no violation of her right to counsel. See Traylor v. State, 596 So.2d 957 (Fla. 1992).
Fourth, Wuornos contends that the trial court improperly denied a change of venue and allowed jurors to be chosen contrary to law. We disagree. The record shows that the parties were able to select jurors who all agreed that any pretrial publicity would not bias them and would not interfere with their ability to honor the trial court's instructions. We find that this was legally sufficient, and that the denial of the request for a change of venue was within the trial court's discretion. There also was no error in denying the excusal of several jurors for cause. All indicated they could abide by the trial court's instructions to the degree required by law. See Walls v. State, 641 So.2d 381 (Fla. 1994).
As her fifth issue, Wuornos argues several errors in the penalty phase. She contends that the jury was not properly instructed on improper "doubling" of the aggravating factors of murder committed for pecuniary gain and murder committed during a robbery. It is true that our subsequent opinion in Castro v. State, 597 So.2d 259 (Fla. 1992), requires such an instruction. However, we find that Castro was intended to have prospective effect only, as we have held in analogous contexts.[4]See Gilliam v. *1008 State, 582 So.2d 610, 612 (Fla. 1991), decision reaffirmed by Groover v. State, 640 So.2d 1077 (Fla. 1994). Thus, we find no reversible error in light of the fact that the trial court's sentencing order properly avoided doubling.
Next, Wuornos challenges the trial court's instruction regarding cold, calculated premeditation. We recently held the standard instruction on this aggravator invalid. Jackson v. State, 19 Fla. L. Weekly S215, 1994 WL 137914 (Fla. April 21, 1994). That instruction also was given here, over defense objections. However, in Walls we held that the error is harmless if
the murder could only have been cold, calculated, and premeditated without any pretense of moral or legal justification even if the proper instruction had been given.
Walls, 641 So.2d at 387 (citing State v. DiGuilio, 491 So.2d 1129 (Fla. 1986)). We therefore must consider whether the four elements of cold, calculated premeditation were sufficiently established here.
The first element is that the murder was "cold." Jackson, 19 Fla. L. Weekly at S217, 1994 WL 137914 at *4. The State's theory of the case here, which was supported by the similar crimes evidence, was that Wuornos coldly and calmly planned this killing and did not act out of emotional frenzy, panic, or a fit of rage. We recognize that Wuornos' own testimony was to the contrary. However, judge and jury were entitled to reject that testimony as self-serving, unbelievable in light of Wuornos' constantly changing confessions, contrary to the facts that could be inferred from the similar crimes evidence, or contrary to other facts adduced at trial. Walls, 641 So.2d at 387-88. Thus, the record establishes coldness to the requisite degree.
The second element is that the murder was the product of a careful plan or prearranged design to commit murder before the fatal incident. Jackson, 19 Fla. L. Weekly at S217, 1994 WL 137914 at *4 (quoting Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988)). On this question, the State's theory of the case was that Wuornos had armed herself in advance, lured her victim to an isolated location, and proceeded to kill him so she could steal his belongings. By definition, this sequence only could be the product of a careful plan or prearranged design. Judge and jury would be within their discretion in rejecting Wuornos' testimony to the contrary, so this element also exists and is sufficiently supported by the record.
The third element is that there must be "heightened premeditation" over and above what is required for unaggravated first-degree murder. Walls, 641 So.2d at 388. We have found this factor present when the prevailing theory of the case established "deliberate ruthlessness" in committing the murder. Id. at 388. The State's theory of the case, especially that relying on the similar crimes evidence and Wuornos' initial confession, established this type of heightened premeditation to the degree required by law. Accordingly, the third element exists here.
The fourth and final element is that the murder must have no pretense of moral or legal justification. Jackson, 19 Fla. L. Weekly at S217, 1994 WL 137914 at *4 (quoting Banda v. State, 536 So.2d 221, 224-25 (Fla. 1988), cert. denied, 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989)). A "pretense" of the type required here is
any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.
Walls, 641 So.2d at 388 (footnote omitted). An incomplete claim of self-defense would fall within this definition provided it is uncontroverted and believable. Id. at 388-89 (citing *1009 Christian v. State, 550 So.2d 450 (Fla. 1989), cert. denied, 494 U.S. 1028, 110 S.Ct. 1475, 108 L.Ed.2d 612 (1990)); Cannady v. State, 427 So.2d 723 (Fla. 1983). While Wuornos' factual testimony advanced an incomplete self-defense claim, we believe that claim was largely controverted by the facts of the murder and the similar crimes evidence together with the items of property Wuornos had taken from her various victims, including Mallory.
Moreover, that testimony also could be rejected as self-serving, untrustworthy in light of Wuornos' inconsistent statements, or inconsistent with the facts  questions that go to the believability of the testimony. Accordingly, the finders of fact would have been entitled to reject the claim and conclude that there was no pretense of moral or legal justification here, which is sufficiently supported by the record.
For these reasons, we conclude that the facts surrounding Wuornos' crime would have established cold, calculated premeditation under any definition. Therefore, the error in not giving the Jackson instruction is harmless beyond a reasonable doubt. Walls, 641 So.2d at 388-89.
Wuornos also argues that the trial court erred in instructing the jury on the factor of murder committed while engaged in the commission of a robbery. She contends the evidence does not support giving the instruction. We disagree. At the very least a jury question existed, in part because items once belonging to Mallory were found in Wuornos' warehouse unit or had been pawned or given away by her. The similar crimes evidence, moreover, tended to bolster the State's theory of the case, which judge and jury clearly believed. We find that a proper jury question existed, which made the instruction proper.
Next, Wuornos states that the jury should not have been instructed on the factor of witness elimination. We disagree. A law officer testified that Wuornos confessed that she wanted Mallory to die because she could not afford to be arrested, which would have resulted in her inability to continue working as a prostitute. As a result, a jury question existed as to whether witness elimination was a dominant motive for the killing. Walls, 641 So.2d at 390.
Wuornos also objects to the instruction on the factor of heinous, atrocious, or cruel, although she concedes that the reformulated instruction was given here. We have upheld the use of that instruction, Walls, 641 So.2d at 387, and do so again here today. Also, the evidence on this factor clearly meant that a question existed to be resolved by the finder of fact, especially in light of the inconsistent confessions made by Wuornos and the similar crimes evidence.
Next, Wuornos contends that the trial court improperly permitted the State to introduce evidence reflecting a lack of remorse by the defendant. One guilt-phase witness stated that Wuornos had laughed while discussing the murder and had said she sometimes felt guilty, and sometimes felt happy, about the murder. However, these ambivalent statements were part of yet another confession Wuornos gave to an officer, which clearly was admissible.[5] The fact that a defendant has confessed in a way that can be construed as showing a lack of remorse does not give rise to error, without more.
Likewise, in the penalty phase Wuornos argues that the State asked a defense expert whether Wuornos had shown guilt or a conscience with respect to the murder. The expert answered no, because Wuornos felt she had acted in self-defense. This testimony, however, was part of the State's effort to show that Wuornos suffered an antisocial personality disorder, meaning she lacked a conscience. Moreover, this testimony was introduced to rebut the defense's contention that Wuornos suffered only from a "borderline personality" disorder that would explain why Wuornos did not subjectively "lie" in her various inconsistent confessions, among other reasons. Once the defense argues the existence of mitigators, the *1010 State has a right to rebut through any means permitted by the rules of evidence,[6] and the defense will not be heard to complain otherwise. There was no error.
Next, Wuornos alleges that the trial court improperly allowed the State during the penalty phase to introduce evidence of Wuornos' collateral murders. This occurred after a defense expert testified that Wuornos' borderline personality disorder explained why her inconsistent confessions should not be considered "lying" or "changing stories." The State then asked the expert whether, for example, the serious inconsistencies in Wuornos' statements about the Carskaddon murder indicated at least some deliberate untruthfulness. The expert said he could not answer the question and that Wuornos' actions may or may not be indicative of truthfulness, in light of her borderline personality disorder.
We find that the defense opened the door to this line of questioning by calling witnesses who testified essentially that Wuornos was not "lying" in a subjective sense because of borderline personality disorder. There was no error in the State's cross-examination. Moreover, the defense experts' vision of psychological science may include the fine distinctions they drew, but the law does not necessarily require the same conclusion. In gauging admissibility in this context, the trial court need be concerned only with the fact that inconsistent statements were made; it is for the finder of fact to determine what motivated the inconsistency.
To that end, qualified experts certainly should be permitted to testify on the question, but the finder of fact is not necessarily required to accept the testimony. As we stated in Walls, even uncontroverted opinion testimony can be rejected, and especially where it is hard to square with the other evidence at hand, as was the case here. Walls, 641 So.2d at 390-91 & n. 8.
Next, Wuornos contends that the jury's role was improperly diminished by jury instructions and prosecutorial comments. This issue was waived for lack of a proper objection and, even if not waived, would be meritless. Combs v. State, 525 So.2d 853 (Fla. 1988); Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989).
Wuornos also argues the State committed various forms of prosecutorial misconduct in the penalty phase. They are that the prosecutor: (a) improperly argued the presence of the pecuniary gain aggravator along with the aggravating factor of murder committed during a robbery; (b) misstated the burden of proof regarding heightened premeditation; (c) improperly argued lack of remorse; (d) improperly diminished the importance of nonstatutory aggravating factors, either factually or legally; (e) improperly argued sympathy should play no role in the jury's recommendation; and (f) improperly equated mental mitigators with insanity. We find all of these claims to be poorly supported by the record and of minor consequence singly or in their totality. Any error would be harmless and clearly was cured by the trial court's instructions to the jury.
Wuornos next contends that the trial court erred in not giving a variety of special instructions requested by the defense. All of these instructions went beyond the approved standard jury instructions, and there was no obligation for the judge to give any of them. See Walls.
As her sixth point, Wuornos argues that the trial court erred in imposing the death penalty based on allegedly invalid aggravators, and without considering valid mitigators. She urges, first, that there is no proof beyond a reasonable doubt that this murder was committed during a robbery. We find no error. One reasonable interpretation of the facts and testimony is that this murder was motivated by a desire to rob the *1011 victim of his car and other belongings. Wuornos' own testimony to the contrary reasonably could have been rejected as untrustworthy in light of her inconsistent statements.
Wuornos next contends that the evidence did not support the factor of witness elimination beyond a reasonable doubt. We disagree. In her initial confession to law officers, Wuornos stated that she killed to eliminate Mallory as a witness. At a minimum, this created a question for the finder of fact to resolve in light of Wuornos' later inconsistent statements. Walls, 641 So.2d at 387-90. The trial court resolved that question against Wuornos, and its decision to this effect is sufficiently supported by the record and cannot be set aside on appeal.
On a related point, Wuornos states that cold, calculated premeditation has not been proven beyond a reasonable doubt. For the reasons noted earlier in this opinion, we hold to the contrary. Cold, calculated premeditation was established beyond a reasonable doubt under any definition. Walls.
Next, Wuornos contends that this murder was not heinous, atrocious, or cruel beyond a reasonable doubt. Wuornos' initial confession to law officers detailed a sequence in which she first struggled with Mallory for no reason other than his refusal to remove his clothes. After winning the struggle, she pointed the gun at him and announced that she "knew" he was going to rape her. Despite Mallory's protestation that he had no intent to rape her, she shot him anyway. Mallory still was conscious and able to walk from the car. In spite of seeing this, Wuornos then ran around to where Mallory was standing, and shot him several more times.
We believe the protracted nature of this killing together with the mental suffering it necessarily would entail created a question for the finder of fact to resolve, especially in light of the similar crimes evidence. Walls, 641 So.2d at 387-88. That question has been resolved against Wuornos, and the resolution is sufficiently supported by the record.
As to the mitigating evidence, we do agree that the trial court should have found and weighed Wuornos' alcoholism and the large and largely uncontroverted body of evidence about the difficulties Wuornos faced as a child, as well as Wuornos' suffering some degree of nonstatutory impaired capacity and mental disturbance at the time of the murder. All experts essentially agreed on these points, including the State's. However, we find no other mitigating factors that the trial court should have considered. In light of the entire record, the failure to find these nonstatutory factors in mitigation is harmless beyond a reasonable doubt, because their weight is slight when compared with the case for aggravation. Even had the error been corrected, there is no possibility of any other outcome.
Seventh, Wuornos argues that the trial court should have granted a motion for judgment of acquittal. As grounds, she alleges that her testimony at trial was uncontroverted and must be accepted as true. As stated above, her testimony clearly was controverted by her own prior inconsistent statements, as supported by the similar crimes evidence and other evidence. Accordingly, the finder of fact was entitled to reject her testimony as unbelievable. There was no error here.
In her eighth and final argument, Wuornos urges this Court to find Florida's death penalty statute unconstitutional on its face or as applied. The statute clearly is constitutional, Thompson v. State, 619 So.2d 261 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993), and its application to Wuornos comported with all constitutional requirements. This argument is without merit. Moreover, we have reviewed the entire record for other errors, including cumulative error. Finding none, we hold that the judgment and sentence are affirmed.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW and HARDING, JJ., and McDONALD, Senior Justice, concur.
*1012 KOGAN, J., concurs specially with an opinion.
KOGAN, Justice, specially concurring.
The facts here present two quite different pictures of Aileen Wuornos. One of these pictures is of a woman who has lived a horrible life of victimization, violence, and little help from anyone, who later lashed out at one of her victimizers. The other is of a cold-blooded killer who lured men to their deaths to steal their property. Because there is sufficient evidence consistent with the latter view as to this murder, the jury and trial court below clearly were within their lawful discretion in recommending and imposing the death penalty here.
In too many ways our society has yet to confront a serious problem arising from women who are forced into prostitution at a young age. Such women typically enter into prostitution as the only possible means of escaping an abusive home environment. The tragic result is that early victimization leads to even greater victimization. And once the girl becomes an adult prostitute, she is labeled a criminal and often is forced into even more crime, as the only means of supporting herself. Few escape the vicious cycle. See Report of the Florida Supreme Court Gender Bias Study Comm'n, 42 Fla.L.Rev. 803, 892-908 (1990).
Aileen Wuornos obviously is an extreme case, but her general life history itself is not rare. I agree with the majority that the similar-crimes evidence was admissible because it supported the State's theory of premeditation, and because it tended to refute Wuornos' claims relating to self-defense. There also is a question as to whether cold, calculated premeditation existed here. On this issue I believe that Wuornos' later statements to law officers and in-court testimony, viewed alone, established a colorable claim of self-defense to the extent outlined in Cannady v. State, 427 So.2d 723 (Fla. 1983). However, the believability of Wuornos' statements is seriously undermined by her initial confession and other inconsistent statements. Moreover, even if cold, calculated premeditation were disallowed, I do not believe the remaining case for aggravation could do anything but outweigh the case for mitigation here. Accordingly, I agree with the majority on this point.
Finally, some might characterize trials such as Wuornos' as social awareness cases, because Wuornos herself unquestionably has been victimized throughout her life. I am aware that some sentiment has arisen to portray Wuornos in this light. Nevertheless, "social awareness" does not dispose of the strictly legal issues, beyond which this Court must be absolutely blind. Whether Wuornos were male or female, the facts remain that the State's theory of this case is sufficiently supported by the record. Therefore, the judgment and sentence must be sustained.
NOTES
[1] The aggravating factors were: (1) Wuornos previously had been convicted of a felony involving the use or threat or violence (a 1982 robbery conviction): (2) The murder was committed during a robbery; (3) murder committed to avoid arrest; (4) The murder was heinous, atrocious, or cruel; and (5) The murder was cold, calculated, and premeditated, without pretense of moral or legal justification. The mitigating factor found by the trial court was that Wuornos suffered borderline personality disorder.
[2] The record at least suggests some lack of continuity between the original defense team and the subsequent one that took over the case before trial. This question is not properly before the Court in this appeal.
[3] Wuornos' testimony obviously was inconsistent with her own prior confessions made to law officers and others.
[4] We recognize that this holding may seem contrary to a portion of Smith v. State, 598 So.2d 1063, 1066 (Fla. 1992), which can be read to mean that any new rule of law announced by this Court always must be given retrospective application. However, such a reading would be inconsistent with a number of intervening cases. E.g., Wyatt v. State, 641 So.2d 355 (Fla. May 5, 1994); Peterka v. State, 640 So.2d 59 (Fla. April 21, 1994); Elam v. State, 636 So.2d 1312 (Fla. 1994); Jackson v. Dugger, 633 So.2d 1051 (Fla. 1993); Taylor v. State, 630 So.2d 1038 (Fla. 1993), petition for cert. filed (U.S. May 11, 1994) (No. 93-9068); Valentine v. State, 616 So.2d 971 (Fla. 1993); Koon v. Dugger, 619 So.2d 246 (Fla. 1993); State v. Johans, 613 So.2d 1319 (Fla. 1993). We read Smith to mean that new points of law established by this Court shall be deemed retrospective with respect to all non-final cases unless this Court says otherwise.
[5] The record reflects that Wuornos made these statements to the officer spontaneously, without being questioned or prompted. Wuornos even stated that her attorney would be mad at her for making the statements.
[6] Indeed, a failure to rebut could justify the finder of fact in concluding that the State does not challenge the existence of the factor, provided the mitigating factor has not otherwise been controverted. Nibert v. State, 574 So.2d 1059 (Fla. 1990); Campbell v. State, 571 So.2d 415 (Fla. 1990). Of course, the factor still can be deemed "controverted" if there is any contrary or inconsistent evidence in the guilt or penalty phases, or if evidence of the factor is untrustworthy, improbable, or unbelievable. Walls.