644 So.2d 1012 (1994)
Aileen Carol WUORNOS, Appellant,
v.
STATE of Florida, Appellee.
No. 81059.
Supreme Court of Florida.
October 6, 1994.
Rehearing Denied November 21, 1994.
*1015 James B. Gibson, Public Defender and Christopher S. Quarles, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Margene A. Roper, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Aileen Carol Wuornos. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The present case involves three separate murder convictions against Wuornos. The first of these was of Charles Humphreys, who was reported missing by his family on September 11, 1990. The following day two young boys discovered his body in an isolated area. Law officers investigating the scene found that Humphreys' pockets were turned inside-out, and his wallet and car were missing. His wallet and identification later were found some fifty miles away, and the car was located behind an abandoned gas station on U.S. 90 at Interstate 10. An autopsy showed that Humphreys died of seven gunshot wounds in a pattern consistent with someone twisting or turning while standing or lying on the ground.
The second murder was of Troy Burress, a delivery truck driver who vanished while making deliveries on July 30, 1990. His truck was found the next day at the intersection of State Roads 40 and 19. The keys were missing and so were Burress's delivery receipts. On August 4, Burress's body was found about eight miles away from the place where the truck had been abandoned. His wallet, credit cards, and receipts were found, but his cash was missing. An autopsy showed he had died of two gunshot wounds to the chest and back.
The third murder was of David Spears, whose badly decomposed body was found in June 1990. The body was nude except for a hat, and a used condom was found nearby. A forensic anthropologist concluded that Spears died of six gunshot wounds. The victim's truck was found at a separate location, abandoned with a flat tire. Spears' toolbox, clothing, a ceramic panther, the vehicle tag, and keys were missing.
Wuornos later was arrested. While in custody, she waived her rights and gave detailed confessions. At later times, she also confessed. The various confessions differed in substantial ways.
In early 1991, Wuornos was indicted for the three murders and three related armed robbery charges. On March 31, 1992, Wuornos pled no contest on all counts with advice of counsel, signing a waiver of rights form so indicating. The plea was accepted as valid and voluntary. A penalty phase then was held in May 1992.
During the penalty phase, the State introduced evidence about the circumstances surrounding the three murders. Wuornos introduced her taped confession to law officers and the testimony of her new adoptive mother, Arlene Pralle. Pralle testified that her relationship with Wuornos began after the latter prayed to God to send her a good Christian woman. As a result, said Pralle, Jesus told her to write to Wuornos in prison. Pralle later adopted Wuornos.
Pralle related hearsay information about Wuornos' childhood, which Pralle had obtained from Wuornos' family and a childhood friend. This information portrayed Wuornos' childhood as one in which she was abandoned by her parents only to be adopted by an abusive grandfather. According to Pralle, Wuornos was raped and impregnated and sent to a house for pregnant teens. Her grandparents forced her to give up the baby for adoption. Later, Wuornos ran away and entered a life of prostitution. Pralle stated she did not believe Wuornos was a serial killer.
The State introduced evidence that Pralle "screened" media requests made to Wuornos *1016 and had received a $7,500 fee to appear on a broadcast show about the murders. Other rebuttal witnesses stated that Wuornos did not suffer an abusive childhood, had threatened to kill another man who had given her a ride in his car: He had seen her gun and tricked her into leaving, then sped away as she brandished her weapon. Other evidence indicated that Wuornos had professed a religious conversion during an earlier incarceration in 1982. Another law officer stated that, while being transported between prisons, Wuornos had threatened him and described a plan in which she would start a revolution and kill police officers.
The jury recommended death by a vote of 10 to 2. The trial court concurred. In his written order, the judge found that there were four aggravating factors in the murders of Burress and Spears: (a) prior violent felony; (b) pecuniary gain; (c) witness elimination; and (d) heightened premeditation. In the murder of Humphreys, the trial court found these same four plus the factor of heinous, atrocious, or cruel. In mitigation, the court found that Wuornos had shown evidence of remorse and a religious conversion, and had suffered a deprived childhood.
As her first issue, Wuornos argues that her no contest plea was not intelligently or voluntarily made. Having read the record, we must respectfully disagree. With defense counsel present, the trial court below conducted an extensive inquiry into Wuornos' reasons for pleading and found the plea to be a product of a knowing and intelligent decision. Wuornos contends that this is not so in part because her chief reason for pleading was so she could return to her prison cell in Broward County, avoiding the stress of another trial. Wuornos later waived her right to be present during the penalty phase for the same reason.
While the accused may consent to be tried in absentia, there is nothing in Florida law requiring that every defendant be notified of that possibility. Any such "right" clearly is not of fundamental constitutional dimension. Moreover, we reject the concept implicit in Wuornos' argument  that a judge somehow is responsible for informing a defendant about the minutiae of trial strategy. While judges certainly must ensure that defendants are aware of fundamental constitutional rights, this does not mean judges must go further and assume the role of legal counsel in explaining every avenue open to the defense. It is emphatically defense counsel's role to tell the defendant of strategies, consequences, and the differing ways trials may be conducted, such as being tried in absentia.
Additionally, Wuornos states that her plea was improper because during the plea colloquy she continued to assert her innocence, based primarily on the claim she had killed in self-defense. We find that Wuornos' plea was not rendered improper. One valid and well recognized strategy in a murder trial is to plead guilty and then appeal for mercy from the sentencer during the penalty phase. Moreover, Florida has recognized that a colorable but incomplete factual claim of self-defense is valid to negate the aggravator of cold, calculated premeditation during the penalty phase. Walls v. State, 641 So.2d 381 (Fla. 1994). Wuornos' claim, in sum, was not inconsistent with her plea, because any colorable claim of self-defense continued to be at issue during the penalty phase.
Nor do we think a plea becomes unallowable merely because the defendant may disagree as to legal conclusions or construction of the facts. It is highly common for defendants to do just that, even after defense counsel has advised that the defendant's interpretation is not a legally valid one. We also note that Wuornos' own statements about her innocence were at best inconsistent, as were her various confessions. She even stated at one point that her newfound religious convictions required her to plead as she did. These facts alone, without more, cannot support the conclusion that her pleas were improperly accepted. By the same token, we do not accept Wuornos' argument that her plea was improper merely because she believes she received no "benefit" for her bargain. Even assuming this is true, nothing in the law imposes such a requirement on criminal pleas.
We also note that Wuornos now contends the trial judge failed to apprise her of the minimum mandatory sentence of life imprisonment. *1017 However, the record discloses that the trial court told Wuornos life imprisonment was one of two "possible sentences that can be imposed in a first-degree murder case." Later in the plea colloquy, the trial court described the penalty phase of a capital trial and Wuornos responded in the following terms:
THE COURT: If the jury comes back with a "guilty" verdict, then we proceed with the sentencing phase. Then the jury will hear evidence of  of mitigation and aggravation.
There is a whole list of considerations that the Court needs to consider under the statute as to what sentence to impose  either the life imprisonment or the death sentence.

BY THE DEFENDANT: Uh-huh.
THE COURT: Did [defense counsel] Mr. Glazer discuss all that with you as well?
BY THE DEFENDANT: Yes, sir.
(Emphasis added.) This exchange might have been more detailed, but it nevertheless establishes that the trial court and defense counsel had apprised Wuornos of, and she understood, the consequences of her plea in this regard.[1] We also find that there was a sufficient factual basis for acceptance of the plea.
As her second issue, Wuornos contends that her statements in the plea colloquy were so rambling or irrational that the trial court sua sponte should have ordered her evaluated for competency to stand trial. The record also shows, however, that her defense counsel stipulated to her competency based on his study of her psychological evaluations and his personal interaction with Wuornos for more than a year.
Having read the record, we also do not find Wuornos' statements in the plea colloquy sufficiently irrational as to require the procedure she suggests. Her comments  particularly her reading of a written statement  shows some difficulty with the English language, but this is entirely consistent with her level of education. The rambling that did occur, moreover, clearly did not suggest a person devoid of her faculties. Her statements were thoughtfully organized toward establishing several points: her remorse, her religious conversion, and her intent to plead no contest.
Moreover, her religious comments in the plea colloquy are not sufficient reason to question her competency. Wuornos did in fact state that her religious beliefs required her to go to the electric chair; that she wanted to "get off this crooked, evil planet" as soon as possible; that she wanted to "go to God, go live in heaven where there's peace and harmony"; and similar remarks. These are statements generally consistent with a person professing the kind of religious conversion Wuornos claimed, and this Court therefore will not look behind them to manufacture a lack of competency. Fervently held religious beliefs do not equate to serious instability.
Third, Wuornos argues that her penalty phase was tainted by the introduction of irrelevant and prejudicial collateral crimes evidence and other collateral matters. This included testimony that Wuornos had threatened police during her incarceration; that, without provocation, she had used her gun to threaten a man who attempted to give her a ride; and that she previously had claimed a religious conversion during her incarceration on other charges in the early 1980s.
Assuming that this issue was properly preserved for appeal, we find all of this evidence was relevant to controvert Wuornos' own theory of the penalty phase. She presented evidence tending to establish that she never attacked without provocation and had undergone a recent religious conversion. Once the defense advances a theory of mitigation, *1018 the State has a right to rebut through any means permitted by the rules of evidence. Wuornos v. State, 644 So.2d 1000, 1009 & n. 5 (Fla. 1994).
Fourth, Wuornos contends that the State was permitted to introduce improper hearsay testimony during the penalty phase. This occurred when the State cross examined defense witness Pralle, who answered in the affirmative when asked if Wuornos' brother ever had stated that their childhoods were not abusive. On direct examination, Pralle had given hearsay testimony indicating the opposite. Wuornos contends her rights were violated because she had no opportunity to question her brother in court regarding the hearsay statements.
Florida law provides that the usual rules of evidence are relaxed during the penalty phase and that hearsay evidence is permissible if a fair opportunity of rebuttal is permitted. § 921.141(1), Fla. Stat. (1991). We have occasionally held that the lack of an opportunity to fairly rebut hearsay renders it impermissible. Dragovich v. State, 492 So.2d 350 (Fla. 1986). Here, however, the defense's direct examination of Pralle rested on hearsay tending to establish one fact. The State itself then rebutted with a cross-examination of the same defense witness that tended to undermine that fact. Our conclusions might be different if the State had opened the door to the hearsay here, but that is not the case. Defense counsel opened the door and will not be heard to complain now. Under the statute, the State had a chance of fair rebuttal through similar hearsay, which it undertook during cross-examination of Pralle. There was no error.
As her fifth issue, Wuornos alleges she was denied her rights when the State's closing arguments urged the jury to take its role seriously even though Wuornos already had been sentenced to death in an earlier murder. Wuornos believes this argument constituted a nonstatutory aggravator because it suggested jurors should return a death recommendation "just in case" the other conviction or sentence were overturned. This issue is waived for failure of defense counsel to object; and in any event, we note that defense counsel had opened the door to this matter when, during voir dire, he spontaneously told jurors that Wuornos had been convicted and sentenced to death in the earlier case.[2] The State argued that this in turn required some effort on its part to assure jurors that their role was a serious one. Even if not waived, we believe there could be no error here based on the United States Supreme Court's holding in Romano v. Oklahoma, ___ U.S. ___, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).
Sixth, Wuornos argues several errors with respect to voir dire. Defense counsel at one point asked jurors to consider what they would want if they were sitting in Wuornos' place at the defense table. We agree with the State that the trial court had discretion to sustain an objection to this line of argument on grounds it constituted a type of Golden Rule argument that was not Wuornos' privilege to make at this stage of the proceedings. Next, counsel told jurors they were never required to vote for death if there was "any bit of mitigation." The State's objection here was properly sustained on grounds that this was an incorrect statement of law.
Additionally, Wuornos believes error occurred when the trial court stopped defense counsel from explaining the concept of "innocence of death." We believe the trial court had discretion to sustain the State's objection: The concept of innocence of death is generally not relevant during a penalty phase, since it is applicable to the problem of successive habeas petitions. See Sawyer v. Whitley, ___ U.S. ___, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). The only relevant issues in the penalty phase are the finding of aggravating and mitigating factors and the assignment of their relative weights. We also agree with the State that the trial court had discretion to sustain the State's objection when defense counsel attempted to tell jurors what evidence they could view as relevant. Questions of relevance are strictly legal matters for the trial court to decide, and *1019 such matters certainly are irrelevant during voir dire.
As her seventh issue, Wuornos argues that there was insufficient evidence to support some aggravating factors found by the trial court, and that valid mitigating factors were improperly ignored. In a general sense, we first find that the premise underlying Wuornos' argument  that the relevant evidence was conflicting  does not of itself undermine a trial court's findings on aggravators and mitigators. The State's theory of the case prevailed here, and we therefore view the record in the light most favorable to the prevailing theory.
Thus, although Wuornos attacks the finding that she committed murder for pecuniary gain, we find her argument unpersuasive. Wuornos' theory was that the taking of property from her victims was an after-thought and revenge for being abused by them, but the State's theory was that it was a primary motivating factor for the murders. We note not only that the State's theory prevailed on this aggravator, but the State's theory is more consistent with the facts of the murders than was Wuornos'. The admissible collateral crimes evidence also seriously undermined Wuornos' theory.
A similar conclusion applies to the trial court's finding that witness elimination occurred, thereby aggravating the crime further. Wuornos herself stated in one of her confessions that she killed to eliminate witnesses. This confession together with the physical evidence of the murders was sufficient to support the State's theory here. The factor therefore has been proven beyond a reasonable doubt.[3]See Wuornos v. State, 644 So.2d 1000 (Fla. 1994). We also find that the State's theory on the factor of cold calculated premeditation prevailed, is consistent with the facts, and was proven beyond a reasonable doubt. See id.
Next, Wuornos alleges that the factor of heinous, atrocious, or cruel was not proven with respect to the Humphreys' murder. Again, we find that the State's theory prevailed, is supported by the facts, and has been proven beyond a reasonable doubt. The physical evidence showed that Humphreys had suffered bruises and abrasions and was shot while in the act of twisting or writhing in a vain effort to avoid his attacker. These facts support the finding that this aggravator was present.
As to mitigation, we first must address a procedural matter. Wuornos argues that we should take judicial notice of the case for mitigation presented in Wuornos v. State, 644 So.2d 1000 (Fla. 1994), and apply it to the instant proceeding. This we may not do. The entire reason for having a trial in a court of record is so that the appellate courts of Florida may review questions of law based on a true transcript of what occurred. While judicial notice of other proceedings certainly is permissible in some instances, it is not proper when the party in effect is asking that we use a wholly separate proceeding to establish a mitigating factor that was not asserted at any time in the proceedings below.
Proceeding to the merit issues raised by Wuornos, we note that the trial court's written findings properly stated its duty to weigh and consider aggravating factors under the principles announced in Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), and Campbell v. State, 571 So.2d 415 (Fla. 1990). In this vein, the trial court made the following findings:
1. As a child, the Defendant was allegedly physically abused in the homes in which she was raised. Hearsay testimony from the Defendant's adoptive mother presented evidence that the Defendant's grandfather, characterized as an alcoholic, allegedly inflicted physical abuse on the Defendant. The statements purportedly came from the Defendant and a childhood friend of the Defendant. The State presented rebuttal evidence in the form of hearsay testimony from an investigator in the Citrus County Sheriff's Department. This investigator traveled to Michigan and interviewed the family members of the Defendant *1020 who denied that any physical abuse occurred within the home. Additionally, the State presented evidence that the same childhood friend, who allegedly told the adoptive mother of the abuse, denied any such knowledge to law enforcement.
2. The Defendant allegedly expresses remorse for the commission of this murder and the murders of other victims. The Defendant's adoptive mother presented hearsay testimony that the Defendant has allegedly experienced a religious conversion and is sorrowful for her past deeds. However, the State presented evidence that, subsequent to the alleged religious conversion, the Defendant, without provocation, threatened the lives of law enforcement officers. Additionally, the Court heard testimony that the Defendant has made similar claims while she was imprisoned in 1982.
The Court finds that the above factors are not supported by the greater weight of the evidence. But even if they were, it is clear that by any reasonable assessment and evaluation of the evidence in the record, the aggravating circumstances overwhelmingly outweigh the evidence presented in mitigation.
We cannot fault the trial court's determination even under the standards of Rogers and Campbell. The vast bulk of the case for mitigation was hearsay. While hearsay can be admissible in the penalty phase, we cannot conceive that there is any absolute duty for the trial court to accept it in mitigation where, as here, the State's rebuttal established strong indicia of unreliability. We find no error in the findings in mitigation.[4]
Finally, Wuornos raises a variety of issues reflecting on the constitutionality of Florida's death penalty statute. Only one deserves any discussion. Wuornos contends that the jury instruction on cold calculated premeditation was constitutionally inadequate. We have recognized that this is true for the instruction actually given here. However, the issue is procedurally barred if no objection was raised below as to the constitutionality of the instruction. Jackson v. State, 19 Fla. L. Weekly S215, 1994 WL 137914 (Fla. Apr. 21, 1994). That being the case here, the issue is waived. The remaining issues also are waived for failure to raise a timely objection or because they are entirely without merit, or both.[5]
Having independently reviewed the record for further errors, and finding none, we affirm both the convictions and sentences.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW, KOGAN and HARDING, JJ., and McDONALD, Senior Justice, concur.
NOTES
[1] We recognize the decision in State v. Coban, 520 So.2d 40 (Fla. 1988), where a conviction was overturned for failure to tell a defendant of the twenty-five-year minimum mandatory sentence when he pleaded guilty to first-degree murder. That case is distinguishable not merely because of the facts noted above, but also because the Coban plea was predicated on the State's agreement not to seek the death penalty there. Wuornos pled without any agreement from the State; and her statements throughout the proceedings establish that she understood the consequences and fully expected to receive the death penalty.
[2] The trial court admonished defense counsel not to do so again.
[3] The defense notes a possible typographical error in the relevant finding on the Spears' murder: The trial court mentions Humphreys' name. However, this statement about Humphreys was merely an inclusive remark about all three of the murders. The trial court specifically finds the factor present for "the Defendant" Spears. We therefore find no error in this regard.
[4] We recognize that in Wuornos v. State, 644 So.2d 1000 (Fla. 1994), we found several mitigating factors. However, nothing remotely resembling the same theory of mitigation was presented here. As noted above, we cannot take judicial notice of another case to establish mitigating factors. Based on this particular record, the trial judge's findings are correct.
[5] These are: (1) that the instruction on heinous, atrocious, or cruel is constitutionally inadequate; (2) that the felony murder aggravator renders the death penalty statute unconstitutional; (3) that the statute is invalid because a death recommendation may be based on a simple majority; (4) that the statute is invalid because it makes elements of the underlying crime into aggravators; (5) that the standard jury instructions violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (6) that Florida's system for designating court-appointed counsel violates the Constitution because it results in representation by inexperienced counsel; (7) that the trial court's role is impermissibly ambiguous; (8) that Florida's judicial system violates the Constitution because its offices are filled by discriminatory means; (9) that Florida's death penalty statute no longer comports with the requirements of Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); (10) that death sentences are unconstitutionally sustained on technicalities; (11) that Florida has maintained and applied contradictory law on the subject of jury overrides; (12) that the lack of a special jury verdict on aggravating and mitigating factors renders Florida's death penalty statute improper; (13) that Florida Rule of Criminal Procedure 3.800(b) violates the Constitution; (14) that Florida law improperly presumes that death is the proper penalty if only one aggravator is found; (15) that the jury instructions given here improperly denied the jury any authority to consider sympathy to the accused; and (16) that electrocution is cruel or unusual punishment.